**In re FUTURE ENERGY CORPORATION, Debtor.**

**Bankruptcy No. 2–87–00552.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Feb. 19, 1988.

E. James Hopple, Todd R. Marti, Schottenstein, Zox & Dunn, Columbus, Ohio, for debtor.

Henry P. Montgomery, IV., Baker & Hostetler, Columbus, Ohio, for Canyon.

Joseph A. Giampapa, Porter, Wright, Morris & Arthur, Columbus, Ohio, for TCO.

Thomas H. Grace, Gamble, Hartshorn & Grace, Columbus, Ohio, for Pattison.

## MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF THIRD AMENDED PLAN OF REORGANIZATION

R. GUY COLE, Jr., Bankruptcy Judge.

### I. PRELIMINARY STATEMENT

This matter is before the Court following a hearing held to consider confirmation of the Third Amended Plan of Reorganization ("Plan") filed in this Chapter 11 case. The Plan has been jointly proposed by Future Energy Corporation (hereinafter "Future" or "debtor" or "debtor-in-possession"), Krutex Energy Corporation ("Krutex") and Canyon Development Corporation ("Canyon")—(hereinafter referred to as the "Proponents"). Objections to confirmation have been lodged by Columbia Gas Transmission Corp. ("TCO"), the holder of an unsecured claim, and Pattison Petroleum Corporation ("Pattison"), the holder of both a secured and an unsecured claim against Future. Upon consideration of the record made at the confirmation hearing, which was conducted in accordance with 11 U.S.C. § 1128, and its review of the post-hearing briefs, the Court issues the following decision.

### II. JURISDICTION

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which the Court may hear and determine. 28 U.S.C. § 157(b)(2)(L). The following consti-

tute findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

### III. FACTUAL BACKGROUND

Future is an Ohio corporation that, since 1977, has been engaged in the business of oil and gas exploration and development. At the present time, Future is operating 48 oil and gas wells which are located in Eastern Ohio and New York.[1] Future operates the wells under arrangements with limited partnerships or other entities involved in drilling and completion programs. Future's ownership interest in the production of such oil and gas wells varies from 0 to 100%, with 20% representing Future's average working interest.[2]

Due to various market and other economic conditions, Future, by early 1986, had incurred large losses and owed substantial sums to its trade creditors. In late 1986 and in January, 1987, Krutex, a publicly-held Utah corporation whose primary business activity involves the production and development of oil and gas reserves in Caldwell County, Texas, commenced negotiations with the principals of Future regarding the acquisition of 100% of the outstanding common shares of Future. Bruce Decker ("Decker"), the Vice–President of Krutex, testified that Krutex intended to acquire Future's stock in an effort to diversify its holdings and expand the geographical scope of its operations. On January 14, 1987, following extensive negotiations, Krutex acquired 100% of the outstanding common shares of Future. Hence, Future became a wholly-owned subsidiary of Krutex prior to filing for relief in this Court.

---

1. Future operates oil and gas wells in Muskingum, Guernsey, Morgan, Ashtabula and Noble counties in Ohio. Future also conducts operations, on a limited basis, in Cattaraugus County, New York. The Court notes that the record was unclear as to whether Future actually operates the oil and gas wells referred to above, or engages the services of independent contractors to conduct the actual physical operation of such wells.

2. A working interest is the operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land. In the situation

of a lessor who executes a lease, reserving ⅛th royalty, to a lessee who creates no burdens on his estate, the working interest consists of ⅞ths of production subject to all costs of exploration and development. The lessor would receive his ⅛th of production free of such costs. *See*, 8 H. Williams & C. Meyers, *Manual of Oil & Gas Terms* at 1086–87 (1987).

In addition to the working interests held by Future in the 48 oil and gas wells which it currently operates, Future also holds overriding royalty interests (*see*, footnote 16, *infra*) in seven other oil and gas wells.

In exchange for the acquisition of Future's stock, Krutex agreed to indemnify George M. Sherry ("Sherry"), the principal shareholder of Future,[3] from any liability resulting from the enforcement of claims held by Ohio Steel Fabricators ("Ohio Steel"), Republic Steel/LTV ("Republic") and Banc-Ohio National Bank ("BancOhio"),[4] creditors whose claims were the subject of Sherry's personal guaranty.

In January, 1987, Canyon, an Ohio corporation which had been formed for the purpose of acquiring control of Future, purchased several claims of Future's creditors in an attempt to obtain Future's assets. At this time, Canyon was acting independently of, and apparently unnoticed by, Krutex in attempting to gain control of the debtor's assets. According to James P. Burgin ("Burgin"), the President and a director of Canyon, Canyon sought to obtain control of Future because Future's oil and gas operation would "fit well" within the operations of Canyon and its affiliates in Eastern Ohio.[5] Transcript of Hearing ("Transcript") at 137.

Krutex's management determined, prior to or at the time it acquired the outstanding stock of Future, that it would be necessary to restructure the debt obligations of Future by filing a case under Chapter 11 of the Bankruptcy Code. Prior to the filing of Future's Chapter 11 petition, Krutex engaged in several transactions which were intended to facilitate the formulation of a plan of reorganization and the ultimate rehabilitation of Future. First, Krutex received an assignment of the claim held against Future by Perkins Drilling Company ("Perkins"), in the face amount of $21,300, in return for a cash payment of $21,130. Second, Krutex loaned $66,400 to Future, which was combined with approximately $40,000 of Future's cash on hand, to satisfy one of the several claims held by BancOhio. This particular BancOhio claim had been acquired from BancOhio by Canyon in January of 1987. Immediate satisfaction of the BancOhio claim was deemed to be necessary given Canyon's threat of a foreclosure action against most of the assets of Future, including Future's oil and gas wells, pipelines and all of Future's accounts receivable. The $66,400 transfer of funds from Krutex to Future was intended to be a loan, as opposed to a contribution of capital to Future. Transcript at 26. In fact, Krutex attempted to collateralize its loan to Future by filing with the appropriate governmental authorities the necessary documents to perfect a "blanket security interest" in all of Future's real and personal property.[6] Transcript at 22. After Krutex and Future had completed the transactions described above, Future filed its Chapter 11 petition on February 10, 1987.

3. At the time Krutex acquired the common shares of Future, Sherry held 490 of the 500 outstanding shares of Future's common stock. The remaining 10 shares were held by Kenneth D. Magyar.

4. BancOhio held several claims against Future which were secured by liens on virtually all of Future's property. The two largest claims held by BancOhio were secured by separate properties. A $107,000 claim of BancOhio, which was assigned to Canyon in January, 1987, and subsequently fully satisfied by Future in February, 1987, was secured by Future's oil and gas wells, pipelines, accounts receivable and equipment. BancOhio also held a second claim against Future in the face amount of $53,319.84, secured by commercial real estate in Zanesville, Ohio, which serves as Future's principal place of business.

5. Burgin testified that Canyon was affiliated with several entities which are engaged in the business of oil and gas development in Eastern Ohio, including Titan Energy Corporation, Universal Well Services and Key Development Corporation. Transcript at 133.

6. Krutex received an advance of $100,000 from its parent company, Foreland Corporation ("Foreland"), which owns 61% of the common stock of Krutex, to fund its transfer of $66,400 to Future in February, 1987. Foreland's $100,000 advance to Krutex was represented by a non-interest bearing promissory note executed by Krutex on February 6, 1987. In lieu of paying interest on this note, Krutex assigned Foreland the 25% working interest in the oil and gas properties of Future and the 25% revenue interest in Future's gas transmission revenue, which had earlier been assigned to Krutex by Future on February 2, 1987. Krutex advanced an additional $9,000 (of the $100,000 received from Foreland) to Future which was utilized by the debtor as working capital.

Future has continued to operate its business as a debtor-in-possession (as authorized by 11 U.S.C. § 1108) since the filing of its Chapter 11 petition. Future has retained and withheld all production proceeds [7] generated from the operation of its oil and gas wells from the petition date to the present. Burgin and Fred Steele ("Steele"), the Secretary and Treasurer of Canyon, testified that Future has withheld all post-petition production proceeds due to uncertainty surrounding: (1) the extent to which Future's working interests are encumbered by secured claims; (2) the precise extent of Future's holdings due to unrecorded assignments of various interests in Future's wells; and (3) the nature and cost of well reworking on Future-operated wells. Steele's uncontraverted testimony established that the production proceeds (approximately $57,000) have been segregated in a separate account by Future and have not been utilized to fund the debtor's post-petition operations. Transcript at 108.

Subsequent to the filing of Future's Chapter 11 petition, Krutex, through Decker and its counsel, continued to negotiate with various creditors of Future in an attempt to obtain assignments of their claims. Prior to engaging in such negotiations, Krutex undertook a thorough review of the claims held by those creditors of Future who claimed secured status. Krutex's claims' analysis included a complete examination of the value of the collateral securing the claims held by each of Future's creditors. Through this claims' analysis process, Krutex attempted to determine whether the claims held by those creditors of Future who claimed secured status were indeed fully secured, partially secured or unsecured.[8] After conducting an analysis of the secured claim held by Republic, in the face amount of $164,000, Krutex purchased this claim for $20,000. According to Decker, Krutex obtained Republic's claim for such a favorable price because Republic simply underestimated the value of the collateral securing its claim. In fact, prior to purchasing Republic's claim, Krutex had independently valued the collateral securing Republic's claim at an amount far in excess of $20,000.

Krutex first became aware that Canyon was also purchasing the claims of Future's creditors in January, 1987, when it was necessary for Krutex to extend the $66,400 loan to the debtor in order to prevent Canyon from enforcing the claim against Future which it had obtained from BancOhio. In the course of its negotiations with various claimholders of Future, Krutex learned that Canyon, in addition to acquiring the BancOhio claim, had also purchased several other claims from creditors of Future. Canyon purchased the claims of Halliburton Co. ("Halliburton") and Ohio Steel for $105,000 and $17,000, respectively. The face amounts of the Halliburton and Ohio Steel claims were $231,578.95 and $91,310.01, respectively.[9] Burgin testified that

7. The phrase "production proceeds" was used repeatedly by the parties at hearing and is also contained in the Plan. However, no definition of this phrase was offered. Although the record is less than clear in this respect, the phrase "production proceeds" appears to refer to the gross revenues received by Future from the sale of oil and gas prior to deduction of the costs and expenses incident to the production and sale of such oil and gas. The production proceeds are apparently then transferred into separate accounts which are subject to the claims of working interest (see, footnote 2, supra) holders and overriding royalty interest (see, footnote 17, infra) holders. Transcript at 108–110.

8. See, 11 U.S.C. § 506(a), which provides:
 (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

9. Halliburton's claim was secured by interests in certain oil and gas wells and by Future's gas pipelines. Ohio Steel's claim was secured by Future's interest in oil and gas wells other than those securing Halliburton's claim.

before Canyon acquired the Halliburton and Ohio Steel claims, it likewise conducted a detailed analysis of such claims, including an estimation of the value of the property collateralizing the Halliburton and Ohio Steel claims. Burgin further noted that it was Canyon's intention to acquire the operations of Future without initiating a Chapter 11 proceeding. Instead, Canyon planned to acquire Future's assets by obtaining the secured positions of Future's creditors and then proceeding with state court foreclosure actions. Transcript at 127.

Because Canyon also was acquiring the claims of Future's creditors, it became apparent by the early summer of 1987 that a "bidding war" had developed between Krutex and Canyon over the control of Future's assets. Krutex determined that the time and expense involved in attempting to successfully reorganize Future would be increased unnecessarily if the competition between Krutex and Canyon continued. Accordingly, Krutex and Canyon commenced a series of negotiations which culminated on August 19, 1987, in the sale by Krutex to Canyon of 80% of the outstanding common shares of Future. Pursuant to the terms of this agreement, Canyon assumed responsibility for Future's actual day-to-day operations. Under the agreement, although Krutex relinquished control of Future's operations to Canyon, it retained a percentage share of Future's oil and gas working and royalty interests. The elements of the agreement between Krutex and Canyon which resulted in their formulation and submission of the Plan, as co-proponents, are summarized below:

1) *Consideration Received by Krutex From Canyon*

(a) Krutex received a cash payment of $66,400 from Canyon.

2) *Consideration Received by Canyon From Krutex*

(a) Canyon received 80% of the outstanding common shares of Future;

(b) Canyon received an assignment of Krutex's claim against Future in the amount of $66,400, which arose from the loan made by Krutex to Future on February 6, 1987, as well as an assignment of the security interests collateralizing its $66,400 loan to Future; and

(c) Krutex arranged for the assignment by Foreland to Canyon of a 25% working interest in the oil and gas properties of Future and a 25% interest in Future's gas transmission revenues. These interests had previously been assigned by Future to Krutex on February 2, 1987, and subsequently reassigned from Krutex to Foreland on February 6, 1987. (*See,* footnote 6, *supra.*) [10]

The testimony of Steele and Burgin established that the individuals who are presently serving as the officers and directors of Canyon—Steele, Burgin and Paul Schaffler—shall also direct and manage the operations of the reorganized Future. Both Steele and Burgin noted that Future is a desirable acquisition for Canyon inasmuch as Canyon will combine Future's oil and gas wells and gas pipelines with its existing operations and thereby continue production at a cost far below that at which Future could operate independently. Transcript at 136.

The Proponents offered the testimony of Steele and Jerry James ("James"), a petroleum engineer employed by E.E. Templeton & Associates, Inc. ("Templeton"), to establish the valuation of Future's oil and gas reserves [11] and support the liquidation analysis contained in the Second Amended

---

**10.** Burgin's testimony established that Canyon and Krutex have agreed that, in the event they fail to gain confirmation of the Plan, Krutex will have the option to re-purchase the shares of Future common stock (which represent an 80% ownership interest in Future) which were transferred to Canyon on August 19, 1987.

**11.** James testified that his opinion as to the value of Future's oil and gas reserves would not

be affected by the fact that some eight (8) months had elapsed since the time he performed his appraisal. James noted that, although the price of oil has increased since his appraisal was made, any increase in Future's oil reserve values would have been offset by a corresponding decrease in gas prices during the same time span.

Disclosure Statement.[12] In addition to James' testimony regarding the value of Future's oil and gas interests, the Proponents also submitted the testimony of Steele, who provided his opinion as to the value of Future's real and personal property and accounts receivable. The evidence offered by the Proponents to support their liquidation analysis—*i.e.*, the testimony of James and Steele—was essentially uncontroverted.[13] The testimony of James and Steele regarding the extent and value of Future's assets, may be summarized as follows:

| | Value |
|---|---|
| a) Oil and Gas Properties | |
| (i) Interests in oil and gas wells | $170,347 |
| (ii) 4.5 inch pipeline | 22,466 |
| (iii) 2.5 inch pipeline | 11,118 |
| (iv) Overriding royalty interests in seven wells | 1,500 |
| Subtotal | $205,431 |
| b) Real Property | Value |
| (i) 2.3 acre tract in Muskingum County with frame building | $ 40,000 |
| (ii) "City Gate" [14] parcels in Columbiana and Morgan Counties | 3,000 |
| Subtotal | $ 43,000 |
| c) Personal Property | Value |
| (i) Cash on hand (less funds held for third parties) | $ 27,169 |
| (ii) Accounts Receivable | 40,000 |
| (iii) Miscellaneous office and oil field equipment | 12,000 |
| Subtotal | $ 79,169 |
| TOTAL | $327,600 |

Future's current liabilities were summarized by Decker. At the time Future's Chapter 11 petition was filed, Krutex, as sole shareholder of Future, thoroughly examined all claims held by creditors of Future. There are approximately $600,000 in secured claims, approximately $30,000 in claims entitled to priority under the Bankruptcy Code and approximately $500,000 in unsecured claims held by creditors of Future. TCO and Pattison questioned whether the insider claims held by Canyon and Krutex truly were entitled to secured status, but did not submit testimonial or documentary evidence to contradict Decker's testimony regarding the total amount of Future's liabilities. Accordingly, the Court finds that Future's current liabilities exceed—by between three to four times—the value of its assets.

The evidence which was adduced by the Proponents regarding Future's prospects for a successful reorganization was scant. In fact, the record reveals that only one question was posed to a single witness—Burgin—regarding the issue of whether confirmation of the Plan would likely be followed by liquidation or the need for further financial reorganization:

> Q. Based on your experience and expertise in the oil and gas business and the knowledge of the operation's assets and liabilities of the Future Energy Corporation and your understanding as to how claims are to be treated under the plan following confirmation, do you think the Third Amended Plan is feasible and not

**12.** The Court entered an order approving the Second Amended Disclosure Statement filed by the Proponents on August 26, 1987.

**13.** TCO and Pattison took issue with the liquidation analysis derived from the testimony of James and Steele on largely legal grounds. The objecting parties repeatedly noted that, if an independent party were to explore and vigorously pursue avoidance actions and object to all legally questionable claims, regardless of the insider status of the claimholder, a much larger dividend than that proposed by the Proponents would be required to be paid to unsecured creditors to satisfy the best-interests-of-creditors tests of § 1129(a)(7). TCO and Pattison also dispute several assumptions upon which the Proponents' liquidation analysis is premised,

such as an estimate of $30,000 in administrative expenses if this case were converted to a case under Chapter 7 of the Bankruptcy Code. However, the objectors introduced no evidence to rebut the testimony as to asset valuation offered by James and Steele.

**14.** The "City Gate" parcels owned by Future were described as three small (20 x 25 ft., or approximately .015 acres) parcels of real estate which were acquired by Future solely to facilitate the transport of gas through Future's pipelines into TCO's main utility in Columbus, Ohio. Two of these parcels are situated in Columbiana County with the third being located in Morgan County. Steele testified that, due to the size of the "City Gate" parcels, they could be put to no other commercial use.

likely to result in the liquidation of the property?

A. As we proposed, yes, I do.

Transcript at 138.

■ The Plan provides for the following classification and treatment of impaired claims: [15]

| Class | Class Member(s) and Proposed Treatment |
|---|---|
| B-2 | Canyon, as assignee of the allowed secured claims of Halliburton and Ohio Steel: The Halliburton and Ohio Steel claims will be released in exchange for the issuance to Canyon of 100% of the stock of the reorganized Future. |
| B-3 | Krutex, as assignee of Perkins and Republic claims: Will be satisfied by the execution of a promissory note from Future to Krutex in an amount equal to the amount of the allowed secured claims of Krutex as the assignee of the claims of Perkins and Republic plus interest at the rate of 9% per annum commencing on the effective date of the Plan.[16] No portion of the principal or interest of said note shall be paid during the first year of the Plan. The note shall be satisfied in equal quarterly payments in years two and three of the Plan. Krutex will retain the liens originally securing the claim of Republic until the note is paid in full. |
| B-4 | Canyon, as assignee of the allowed secured claim of Krutex for funds loaned Future as evidenced by a promissory note dated February 6, 1987: Will be satisfied by a cash payment to Canyon on or after the effective date of the Plan equal to the allowed amount of such claim. |
| B-5 | Judgment lien creditors: The allowed claims of judgment lien creditors will be treated as unsecured pursuant to 11 U.S.C. § 506. |
| B-6 | Ohio mechanics' lien claimants: The claims of Ohio mechanics' lien claimants will be treated as unsecured pursuant to 11 U.S.C. §§ 506 and 545. |
| C-1 | Holders of recorded overriding royalty interests[17] and recorded working interests for un- |

| Class | Class Member(s) and Proposed Treatment |
|---|---|
| | paid production proceeds payable to the holders of such interests: Will be satisfied on the effective date by the issuance to such holders of common stock of Krutex at its market value as of the effective date of the Plan in an amount equal to the allowed amount of such production proceeds claims. In addition, the holders of recorded overriding royalty interests and recorded working interests shall at their option retain their overriding royalty interest and/or working interest, or, in exchange for the assignment to Krutex of the overriding royalty interests and working interests, receive on the effective date shares of Krutex common stock valued on the effective date at five (5) times the value of such outstanding overriding royalty interests and working interests, based upon the sum obtained from the average monthly production proceeds from all applicable wells for the period of July through December 1986. |
| C-2 | Holders of unrecorded assignments of working interests from Future and voidable assignments of working interests: Shall be treated as unsecured Class D-1 claims. |
| D-1 | Holders of allowed unsecured non-priority claims: Shall be satisfied by a cash payment equal to 5% of the allowed amount of such claims. If any such claim is subject to objection, payment shall be made within 30 days after the entry of a final, nonappealable order allowing the claim. Payments on claims that are not subject to objection shall be made on or before the 10th day following the effective date of the Plan. |
| E-1 | Current shareholders of Future: The present stock of Future shall be cancelled and the holders thereof shall receive no payment or consideration under the Plan for such stock. |

As the foregoing summary of the classification and treatment of claims reflects, Class C-1 claimants (holders of properly-recorded overriding royalty interests and recorded working interests) will be satisfied

---

**15.** The Code defines the concept of claim impairment in 11 U.S.C. § 1124. Generally speaking, a creditor's claim or interest is impaired if the plan alters the legal, equitable and contractual rights to which such creditor is entitled. For a more comprehensive discussion of the concept of claim impairment, *see*, Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 138–40 (1979).

**16.** The term "Effective Date" is defined within the Plan as 90 days after the date on which the order confirming the Plan becomes final and nonappealable, and on which no appeal is pending.

**17.** The Tenth Circuit Court of Appeals in *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882, *rev'd.*, 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261, *reh'g*

*denied,* 375 U.S. 989, 84 S.Ct. 515, 11 L.Ed.2d 476 (1964) offered the following definition of an overriding royalty interest:

An overriding royalty is a fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor, free of any expense for exploration, drilling, development, operating, marketing and other costs incident to the production and sale of oil and gas produced from the lease. It is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, as distinguished from the owner's reserved royalty interest. It is generally held that an overriding royalty is an interest in real property.

by the issuance of Krutex common stock with a value equal to the allowed amount of each C–1 claim.[18] The Proponents offered the testimony of Dennis Hoover ("Hoover"), a stockbroker employed by the brokerage firm of R.B. Marich ("Marich") of North Newport Beach, California. Marich is currently one of 10 brokerage companies that trade Krutex stock. Hoover noted that, within the 60 days preceding the hearing, over 100,000 shares of Krutex stock were traded by Marich's North Newport Beach office. Hoover further testified that, as of the date of the confirmation hearing, Krutex stock, which is listed in the "Pink Sheets" published by the National Quotation Bureau, was trading at a price of between $1.00 to $1.88 per share. Krutex stock has fluctuated in price during the six months preceding the confirmation hearing from a low of $.56 per share to $1.88 per share as of the hearing date. Hoover stated that Marich would be willing to purchase, on a single-transaction basis, as many as 10,000 shares of Krutex stock as of the date of the confirmation hearing. Hoover conceded that Marich's 10,000–share purchase limit was subject to changing market conditions and that holders of Krutex stock would have no assurance that Marich, or any other trader of Krutex stock, would stand willing to purchase Krutex stock, in a fixed amount on any given date.

The Plan provides for the cancellation of all the existing shares of Future's stock. Upon confirmation, however, 100% of the stock of the newly-reorganized Future would be issued to Canyon. In return, Canyon proposes to make a capital contribution consisting of the following:

(1) To the extent that the post-confirmation revenues of Future are insufficient to pay the five percent dividend to unsecured creditors contemplated by the Plan, Canyon will fund the distribution to unsecured creditors. Approximately $35,000 will be required to provide for unsecured creditors under the Plan;

(2) Canyon will release Future from all liability on the secured claims of Halliburton and Ohio Steel, in the face amounts of $231,578.95 and $91,310.01, respectively, which were purchased by Canyon for $105,000 and $17,000, respectively; and

(3) Canyon will pay the attorney fees it incurred in connection with the formation and proposal of the Plan and will not seek to recover such fees from the estate.

Transcript at 136–38.

Classes B–5 and B–6, both of which are impaired classes, have voted in favor of acceptance of the Plan.[19] Classes C–1, C–2 and D–1 have rejected the Plan. Thus, the Proponents are seeking confirmation of the Plan over the objection of one rejecting secured class (Class C–1) and two rejecting unsecured classes (Classes C–2 and D–1).[20]

## IV. DISCUSSION

### A. *Introduction*

#### 1. *The Objections of the Parties*

TCO and Pattison have strenuously objected to confirmation of the Plan on a

---

**18.** Class C–1 claimants will receive Krutex common stock having a value of five times the amount of their allowed claims if they elect to assign their overriding royalty/working interests to Krutex.

**19.** Section 1126(c) of the Bankruptcy Code provides:

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

Section 1129(a)(10) requires as a condition of confirmation that at least one class of impaired claims accept the plan. Section 1129(a)(10) further provides that, in determining whether one impaired class has accepted the plan, the Court may not consider any acceptance of the plan by an insider (*see*, footnote 23, *infra*). Hence, while Classes B–2, B–3 and B–4 have accepted the Plan, these classes are comprised solely of insider claims and cannot be considered in determining whether compliance with § 1129(a)(10) has been achieved.

**20.** The Court's determination that Class D–1 should be deemed to be a rejecting class is discussed *infra* at 490–92.

number of grounds. The specific statutory bases for the objections filed by TCO and Pattison are enumerated below.

*Objection # 1:* The Plan does not comply with § 1129(a)(1) of the Code for the following reasons:

(a) The claims of Krutex and Canyon (Classes B–3 and B–4) should be equitably subordinated to the claims of Classes B–5, B–6, C–1 and C–2 pursuant to 11 U.S.C. § 510;

(b) Pattison's C–1 claim should be granted administrative expense status and, therefore, its placement in Class C–1 together with dissimilar claims, *i.e.,*—claims that are secured by postpetition production proceeds—violates § 1122(a);

(c) The Proponents have violated § 363(c)(2) of the Code by utilizing cash collateral (*i.e.,* postpetition production proceeds) without either the consent of the entities having an interest in such cash collateral (including Pattison) or Court authorization; and

(d) The Plan improperly provides for the release of potential claims against third parties, *i.e.,* Krutex and Canyon, in violation of § 524(e) of the Code;

*Objection # 2:* The Plan has not been proposed in good faith as required by § 1129(a)(3);

*Objection # 3:* The Proponents have failed to include a provision in the Plan providing that all payments to be made under the Plan are subject to Court approval as mandated by § 1129(a)(4) and have likewise failed to comply with the disclosure requirements of § 1129(a)(5);

*Objection # 4:* The Plan does not satisfy the "best-interests-of-creditors test" contained in § 1129(a)(7) because the Proponents have not shown that the creditors rejecting the Plan will receive under the Plan not less than that which they would receive through a Chapter 7 liquidation;

*Objection # 5:* The Proponents have not complied with § 1129(a)(9)(A) of the Code, given their failure to provide for payment of Pattison's administrative expense claim in cash as of the effective date of the Plan;

*Objection # 6:* The Plan does not comply with § 1129(b) of the Code because, with respect to dissenting classes of claims (C–1, C–2 and D–1) the Plan:

(a) discriminates unfairly; and

(b) is not fair and equitable.

## 2. Burden of Proof

■ Prior to undertaking an analysis of the objections to confirmation raised by TCO and Pattison, the Court believes that it would be of benefit to outline the evidentiary standards that apply in the Chapter 11 confirmation process. Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court a mandatory duty to determine whether a plan meets all the requirements for confirmation delineated in § 1129(a) of the Code. *In re Economy Cast Stone Co.,* 16 B.R. 647, 650 (Bankr.E.D.Va.1981); *Matter of Nikron, Inc.,* 27 B.R. 773, 777 (Bankr.E.D.Mich.1983); *In re Trail's End Lodge, Inc.,* 54 B.R. 898, 902–03 (Bankr.D. Vt.1985); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). The Proponents bear the burden of proving that the requirements of § 1129(a) have been met. *In re Trail's End Lodge, Inc.,* 54 B.R. at 903; *In re Prudential Energy Co.,* 58 B.R. at 862; *In re Hoosier Hi–Reach, Inc.,* 64 B.R. 34, 37 (Bank.S.D.Ind.1986). Further, the Proponents have the burden of proving that the plan meets the fair and equitable standard, which is subsumed in § 1129(b)'s so-called "cram-down" requirements, by clear and convincing evidence. *In re Stoffel,* 41 B.R. 390, 392 (Bankr.D. Minn.1984); *In re Agawam Creative Marketing Assoc., Inc.,* 63 B.R. 612, 618–19 (Bankr.D.Mass.1986).[21] With the foregoing

---

21. It is well-established that the proponents of a Chapter 11 plan bear the burden of proving compliance with the requirements of § 1129(a). However, the case law is not so clear with respect to the burden of producing evidence in cases where objections to confirmation have been filed. Several courts have held that the objecting party must produce evidence to establish the validity of the objection before the ultimate burden of proving that all of the requirements of § 1129(a) have been met is shifted to the plan proponent. *See, In re Silver Falls Petro-*

principles in mind, the Court in turn will consider the objections to confirmation asserted by TCO and Pattison, as well as any other relevant issues raised by the Court's independent review of the Plan.

### B. *Objection #1: Compliance with § 1129(a)(1)*

Section 1129(a)(1) provides that, before the Court can confirm a Chapter 11 plan, it must determine that the plan complies with all the applicable provisions of the Bankruptcy Code.[22] TCO and Pattison argue that the Plan and/or the Proponents have not complied with the applicable provisions of the Bankruptcy Code in several respects. Each of these alleged areas of noncompliance with the Code will be analyzed below.

#### 1. Equitable Subordination

TCO has asserted that the Plan fails to comply with § 1129(a) of the Code because it does not provide for equitable subordination of two insider claims:[23] (1) the B–3 claim held by Krutex; and (2) the B–4 claim which was originally held by Krutex and

subsequently assigned to Canyon on August 19, 1987. Krutex's B–3 claim in the amount of $41,300 arose from its receipt of assignments of the claims of Perkins ($21,-130) and Republic ($20,000). The B–4 claim held by Canyon was assigned to it by Krutex. This claim arose from the loan of $66,400 made by Krutex to Future immediately prior to Future's filing of the Chapter 11 case. TCO argues that both the purchase of the Perkins and Halliburton claims by Krutex, as well as Krutex's $66,400 loan to Future, should be treated as capital contributions and, hence, equitably subordinated.

The doctrine of equitable subordination originated to safeguard creditors of the debtor from having to share the value of the estate with owners of the debtor that assert wrongful claims against it. *See generally,* Bienenstock, *Bankruptcy Reorganization* at 638–643 (1987); Chairman, *The Equitable Subordination of Bank Claims,* 39 Bus.Law. 1561 (1984); Cohn, *Subordinated Claims: Their Classification and Voting Under Chapter 11 of the Bankruptcy Code,* 56 Am.Bankr.L.J. 293 (1982).

---

*leum Corp.,* 55 B.R. 495, 497 (Bankr.S.D.Ohio 1985) (per Perlman, C.J.) ("[T]he objector must bear the burden of establishing the validity of his objection or the objection fails."); *In re Northeast Dairy Co-op. Federation, Inc.,* 73 B.R. 239, 248 (Bankr.N.D.N.Y.1987) ("[T]he objecting party ... bear[s] the burden of proving the validity of the objections. Once the objecting party has established reasons why the objection(s) should be recognized, the Plan-proponent bears the burden of proving that all the requirements of Code § 1129(a) have been met."). Because the parties have not squarely raised the issue of the proper allocation of the burden of production with respect to the objections to confirmation asserted in this case, the Court need not decide the question here. The Court believes that, due to its independent duty to determine that the Proponents have achieved compliance with each of the requirements enumerated in § 1129(a) (and, where applicable, § 1129(b)), the ultimate burden of proof is properly imposed upon the Proponents. Nevertheless, the Court concurs with the *Silver Falls* and *Northeast Dairy* decisions to the extent that these decisions hold that an objecting party is required to do more than merely raise an objection. Some evidence in support of the objection must be adduced, or, if the objection is premised upon purely legal grounds, persuasive authority must be offered to support the objection.

**22.** TCO and Pattison have asserted that, in addition to the Plan's noncompliance with

§ 1129(a)(1), the Proponents also have failed to comply with all the applicable provisions of Title 11 as mandated by § 1129(a)(2). The Court's analysis of the alleged violations of both § 1129(a)(1) and (a)(2) shall be combined for purposes of discussion.

**23.** The definition of an "insider" is set forth in 11 U.S.C. § 101(30), which provides in pertinent part as follows:

(30) "insider" includes—

 * * * * * *

(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;
....

As of the petition date, Krutex owned 100% of the outstanding common shares of Future and, therefore, would be deemed to be an insider of the debtor. On August 19, 1987, Canyon acquired 80% of Future's common shares from Krutex. Accordingly, Canyon also falls within the definition of an insider set forth in § 101(30)(B)(iii).

Section 510(c) of the Code, which governs equitable subordination, provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The legislative history to § 510(c) indicates that the "principles of equitable subordination" referred to in this section are to be found in the case law on the subject. *See,* S.Rep. No. 989, 95th Cong., 2d Sess. 74, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5860. *See also, Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.),* 799 F.2d 726 (11th Cir.1986).

The seminal decision involving equitable subordination was rendered by the Fifth Circuit in *Benjamin v. Diamond (Matter of Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977), a case decided under the Act. The court in *Matter of Mobile Steel Co.* articulated a three-prong test for determining when equitable subordination is appropriate. This three-prong test, which has been restated in later decisions applying the Bankruptcy Code, provides that equitable subordination is proper where the following elements are established:

(1) that the claimant has engaged in inequitable conduct;

(2) that the conduct has injured creditors or given unfair advantage to the claimant; and

(3) that subordination of the claim is not inconsistent with the Bankruptcy Code.

*Matter of Mobile Steel Co.,* 563 F.2d at 700; *Matter of Multiponics,* 622 F.2d 709,

713 (5th Cir.1980); *In re N & D Properties, Inc.,* 799 F.2d at 731.

The decisional law also has elaborated upon the burden and sufficiency of proof required in equitable subordination cases. Where the claimant is an insider or a fiduciary, the party seeking equitable subordination bears the burden of presenting material evidence of unfair conduct.[24] *See, Matter of Multiponics,* 622 F.2d at 714; *In re N & D Properties, Inc.,* 799 F.2d at 731. Once the party seeking subordination satisfies this burden, the claimant must then prove the fairness of his transactions with the debtor or his claim will be subordinated. *Id.* If the claimant is not an insider or fiduciary, however, the party seeking subordination must prove more egregious conduct such as fraud, spoilation or overreaching, and prove it with particularity. *See, In re N & D Properties, Inc.,* 799 F.2d at 731; *In re Ludwig Honold Mfg. Co.,* 46 B.R. 125, 128 (Bankr.E.D.Pa. 1985).

In addition to insider misconduct, bankruptcy courts also have ordered equitable subordination where they have determined that insider loans should be recharacterized as capital contributions. *See, Matter of Multiponics, Inc.,* 622 F.2d at 718–19; *In re N & D Properties, Inc.,* 799 F.2d at 733; *In re A.F. Walker & Sons, Inc.,* 46 B.R. 186, 189–90 (Bankr.D.N.H.1985). The Eleventh Circuit in *In re N & D Properties, Inc.* held that insider loans should be deemed to be capital contributions in one of two circumstances: "where the trustee proves initial under-capitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit." 799 F.2d at 733.

In the *A.F. Walker & Sons* case, the court applied a more relaxed standard in determining whether insider loans should be deemed to be capital contributions. Judge Yacos noted that the concept of eq-

---

**24.** Allocation of the burden of producing material evidence of unfair conduct to the party seeking subordination is based in part upon the fact that B.R. 3001(f) creates a presumption in favor of the validity of a claimant's proof of claim. To overcome this presumption, the par-

ty arguing in favor of equitable subordination is compelled to come forward with sufficient evidence of unfair conduct to shift to the claimant the burden of proving the good faith and fairness of his transactions with the debtor. *Matter of Mobile Steel Co.,* 563 F.2d at 701.

uitable subordination allows for recharacterization of insider loans as contributions of capital in instances other than those involving either actual misconduct on the part of a corporate insider or initial undercapitalization of the company in question. The *A.F. Walker & Sons* court stated:

It is sufficient for present purposes to note that the evolving standard in this area requires as a minimum that the following be shown to support recharacterization or equitable subordination: (1) The insider-claimant was in a position to, and did, dominate the affairs of the debtor corporation; (2) that at the time of the transaction in question the insider was aware of financial conditions and problems, of which the general unsecured creditors were not generally aware, which made it unrealistic to believe that the "debt" in question would be paid off within any specific time frame as a true debt, as opposed to a further risk-investment in the company; (3) that objectively the ultimate repayment of the "debt" in question was dependent upon a return to profitability by the company or other substantial "turn-around" in its business operations; and (4) that to give such an insider-claimant on such facts equal status as a "creditor" would be to give the insider an "unfair advantage" over other creditors who existed at that time and still remain unpaid in the bankruptcy proceeding.

46 B.R. at 189.

■ Applying the principles discussed above to the present case, the Court is compelled to conclude that TCO has not met its burden of producing sufficient evidence to warrant subordination of the B–3 and B–4 claims held by Krutex and Canyon, respectively. TCO has offered no evidence to establish either of the traditional requirements of equitable subordination: actual insider misconduct or initial undercapitalization. Further, even under the more liberal "evolving standard" described by Judge Yacos in *A & F Walker & Sons*,

which does not require a showing of actual misconduct in the traditional sense, TCO has not met its burden. While the record supports the presence of the first factor set forth by the court in *A & F Walker & Sons*, TCO clearly did not adduce material evidence establishing the existence of the remaining three criteria.

TCO argues that Krutex's loan of $66,400 to Future, upon which the B–4 claim is based, directly benefitted Krutex and gave it an unfair advantage over other creditors. The Court is not satisfied that this is the case. While the $66,400 loan enabled Future to satisfy a liability (the BancOhio claim) upon which Krutex was jointly liable pursuant to its indemnity agreement with Sherry, the loan also prevented BancOhio's foreclosure on virtually all of the debtor's property and, thus, permitted Future to continue its reorganization effort. Hence, while the $66,400 loan incidentally benefitted Krutex, the Court is not convinced that this loan gave Krutex an unfair advantage over Future's other creditors. In short, the record simply does not support either a finding of insider misconduct or any other factual basis to justify equitable subordination. Accordingly, the Court holds that the Proponents' failure to seek equitable subordination of the B–3 and B–4 claims does not constitute a violation of § 1129(a)(1).

### 2. Pattison's Entitlement to an Administrative Expense Claim

■ Pattison contends that its C–1 claim, which is secured by Future's interest in post-petition production proceeds, should be granted administrative expense status given the fact that Future utilized the production proceeds to fund its post-petition operations. From this starting point, Pattison reasons that, because its "administrative expense" claim is placed in Class C–1 together with other secured claims, the Plan violates § 1122(a), which provides that only claims or interests which are substantially similar may be placed in the same class.[25]

---

**25.** Section 1122(a) states:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

Pattison's assertion that its C–1 claim should be treated as an administrative expense was baldly made, without any cited statutory or decisional law support. Because Pattison's argument is completely lacking in supporting authority, it may be disposed of summarily.[26] Pattison's contention that Future's use of the production proceeds benefitted the estate also fails of factual support. The unrebutted testimony of Steele established that the production proceeds were segregated in a separate account and not utilized by Future to fund its post-petition operations. Transcript at 108–110, 117. Accordingly, the Court concludes that, despite Pattison's protestations to the contrary, there is simply no legal or factual basis upon which to predicate a finding that Pattison's claim is entitled to administrative expense status.[27]

### 3. Use of Cash Collateral

█ Pattison also argues that confirmation of the Plan should be denied because Future has violated § 363(c)(2) of the Code by utilizing cash collateral (*i.e.*, the postpetition production proceeds) without either the consent of Pattison or Court authorization. Unauthorized usage of cash collateral has been found to be a ground for denial of confirmation of a Chapter 11 plan. *See, Cothran v. United States (Matter of Cothran)*, 45 B.R. 836, 838 (S.D.Ga.1984) (debtors' unauthorized use of cash collateral precluded them from satisfying the good faith test of § 1129(a)(3)). Again, Pattison's argument is clearly lacking in evidentiary support. As discussed above, Steele testified that the production proceeds have been placed in a separate bank account and not used to fund the post-petition operations of Future. Hence, the record simply does not support Pattison's contention that Future has utilized cash collateral without Court authority or the consent of Pattison in contravention of § 363(c)(2).

### 4. Release of Third Parties

█ TCO and Pattison assert that the provision contained in the Plan which purports to release Krutex and Canyon from all claims and causes of action held by parties receiving distributions under the Plan ("Release Provision") violates § 524(e) of the Code. The Release Provision provides in relevant part as follows:

> [A]ny creditor receiving distributions pursuant to this Plan shall be conclusive-

26. Presumably, Pattison's argument that it is entitled to have its claim allowed as an administrative expense is premised upon § 503(b)(1)(A) which provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, ... including—
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case: ....

Pattison apparently contends that Future's use of the production proceeds allowed Future to continue its operations, thereby preserving the estate. Pattison failed to make reference to § 503(b)(1)(A), either in its memoranda or orally, at the confirmation hearing. Thus, the Court need not further address this issue, since it is clearly not the role of the Court to both formulate and pass upon the legal arguments of the parties.

27. Pattison's claim against Future arises under drilling and operating agreements executed by and between Pattison and Future. Under these agreements, Pattison received an overriding royalty interest and a working interest in various oil and gas wells. Although Pattison was listed by the Debtor as a party to numerous executory contracts in filings with the Court, Pattison was not scheduled as a creditor and its name was not placed upon the mailing matrix filed with the Bankruptcy Clerk. As a result of its lack of actual knowledge or notice of Future's bankruptcy case, Pattison failed to file a proof of claim prior to the June 15, 1987, deadline established by the Court. However, Pattison sought and obtained an order of this Court finding Pattison's proof of claim, which was filed on September 24, 1987, to be timely filed. Review of Pattison's proof of claim reveals that its claim was listed as secured to the extent of the value of the retained production proceeds and unsecured as to the balance of the claim (which cannot be determined until an accounting is performed). Pattison's proof of claim does not state that Pattison's claim should be allowed as an administrative expense or priority claim. Further, Pattison has not filed a motion seeking allowance of its claim as an administrative expense pursuant to 11 U.S.C. § 503(a). Thus, Pattison's contention that its claim should be allowed as an administrative expense apparently was advanced for the first time at the hearing on confirmation of the Plan.

ly presumed to have fully released Future, Krutex, Canyon and their affiliates for any debt for which such distributions are received. Such release shall be given in consideration of the funding of this Plan by Krutex and Canyon and shall be enforceable against any claimant receiving distributions as a matter of contract. Acceptance of distributions pursuant to this Plan of Reorganization by any holder of an Allowed Claim or allowed interest shall constitute, except as set forth herein, a full, complete, final and binding release of any and all claims, actions or causes of actions, now or heretofore existing, whether asserted or unasserted, as to Future, Krutex, Canyon and their affiliates.

The Court concludes that the Release Provision violates § 524(e) of the Code and, thereby, causes the Plan to run afoul of § 1129(a)(1). Section 524(e) provides that the "... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Section 103(a) provides that § 524(e) is applicable to any case under Chapter 11 of the Bankruptcy Code. The clear weight of decisional authority supports the proposition that Chapter 11 plans which call for the release of nonparties (such as guarantors) from liability upon obligations of the debtor are violative of § 524(e). *See, Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir.1985); *In re Eller Bros., Inc.*, 53 B.R. 10, 12 (Bankr.M.D.Tenn.1985); *In re L.B.G. Properties, Inc.*, 72 B.R. 65, 66 (Bankr.S.D.Fla.1987). *But see, In re AOV Industries, Inc.*, 792 F.2d 1140, 1145 (D.C. Cir.1986); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 16 B.C.D. 1077, 1082–83 (Bankr.E.D.Pa.1987) (holding that consensual release of third-parties pursuant to a Chapter 11 plan is permitted). Since the Release Provision purports to release Krutex and Canyon from liability on Future's

debts, and from all other potential claims and causes of action, the Court finds that this aspect of the Plan violates § 524(e) of the Bankruptcy Code.

### C. *Objection #2: Compliance With The Good Faith Requirement of § 1129(a)(3)*

Section 1129(a)(3) of the Code requires that a Chapter 11 plan be proposed in good faith and not by any means forbidden by law. The term "good faith" is not specifically defined in the Code. Essentially, a reorganization plan is proposed in good faith when there is "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Nite Lite Inns*, 17 B.R. 367, 371 (Bankr.S.D.Cal. 1982). *See also, Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 764 (1st Cir.1983); *Matter of Madison Hotel Associates*, 749 F.2d 410, 424–25 (7th Cir.1984); *Matter of Nikron, Inc.*, 27 B.R. at 778. The determination as to whether a plan will likely achieve a result consistent with the objectives and purposes of the Code should be made in view of "the totality of the circumstances surrounding confection" of the plan. *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984) (quoting *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983)).

The objectors' contention that the Plan has not been proposed in good faith is predicated upon their belief that Future will not properly fulfill its fiduciary duties as debtor-in-possession.[28] Specifically, TCO and Pattison argue that in this case no "independent third-party" will examine the insider claims of Krutex and Canyon to determine whether such claims should be disallowed in whole or in part. In addition, it is argued that there will be no objective analysis of the liens obtained by Krutex and Canyon in transactions occurring immediately prior to the petition date, or shortly thereafter, in order to ascertain whether such liens may be avoided pursu-

---

**28.** Pursuant to 11 U.S.C. § 1107, a debtor-in-possession possesses all the rights, powers and duties of a trustee. Included among such duties is the duty to "examine proofs of claims and object to the allowance of any claim that is

improper." 11 U.S.C. § 704(1). In addition, the debtor-in-possession may also exercise the avoidance powers granted to a trustee pursuant to 11 U.S.C. §§ 544–549.

ant to 11 U.S.C. §§ 544–549. Transcript at 16, 181. TCO contends that if the Plan is confirmed, Canyon, which will own 100% of the stock of the debtor-in-possession, will, in effect, determine whether its B–4 claim should be allowed as a secured claim and, if so, in what amount. TCO argues that this is tantamount to the "fox watching the hen house." Transcript at 181.

Having analyzed the record made at hearing, the Court is satisfied that the requisite good faith has been established by the Proponents. The Plan is proposed as a means to effect the rehabilitation of a financially-distressed entity—a policy which the Bankruptcy Code was enacted to effectuate. Further, the Court simply cannot conclude that it would be appropriate to deny confirmation of the Plan due to non-compliance with § 1129(a)(3) solely on the basis of the objectors' suspicion that the debtor-in-possession will fail to properly carry out its post-confirmation fiduciary obligations.

Clearly, an attempt by a debtor-in-possession to give favorable treatment to an insider is violative of § 1129(a)(3)'s good faith requirement. *See, e.g., Matter of Barr*, 38 B.R. 323 (Bankr.E.D.Mich.1984); *In re Smithfield Estates, Inc.*, 52 B.R. 220, 223 (Bankr.D.R.I.1985). Here, however, the good faith objection advanced by TCO and Pattison is not supported by evidence. Instead, it is premised purely upon the objectors' speculation as to the debtor-in-possession's *future* conduct, *i.e.*, the presumption that Future will not pursue avoid-

ance actions or object to insider claims. Accordingly, the Court rejects the objectors' assertion that the Plan has not been proposed in good faith.

The Court notes that if the debtor-in-possession subsequently fails to perform its fiduciary duties, the creditors in this case, including the objecting parties, are not left without effective remedies. First, the right to object to the claims of the insiders is not limited to the debtor-in-possession. Pursuant to 11 U.S.C. § 502(a), any party-in-interest may object to a proof of claim. Thus, if TCO or Pattison wishes to object to the claims held by the insiders in this case, *i.e.*, Krutex and Canyon, they may do so pursuant to § 502(a). Second, the objectors, or any other party-in-interest, may move for the appointment of a trustee or examiner under § 1104 of the Code if cause, such as fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor can be established. In short, if an actual showing can be made that the debtor-in-possession has failed to fulfill its fiduciary duties, a number of remedies may be invoked. However, denial of confirmation for failure to meet the good faith requirement of § 1129(a)(3) is not warranted here by the mere unsupported allegations of bad faith raised by TCO and Pattison.[29]

D. *Objection # 3: Compliance with §§ 1129(a)(4) and (a)(5)*

TCO and Pattison contend that the Proponents have failed to comply with subsec-

---

**29.** Although the Court has rejected the objectors' contention that the Plan has not been proposed in good faith, the concern raised regarding the necessity of independent analysis of the insider claims is valid. However, this concern is more appropriately expressed as a conflict-of-interest issue than a good faith objection. Here, counsel for the debtor-in-possession also represents one of the Plan's co-proponents, Krutex, which is a shareholder of the debtor-in-possession and a holder of secured claims against the estate. Although the Court need not address this matter at present, it notes that such dual representation may well violate § 327(a)'s requirement that counsel for the debtor be disinterested. *See, In re Chou–Chen Chemicals, Inc.*, 31 B.R. 842 (Bankr.W.D.Ky.1983); *Matter of Roger J. Au & Son, Inc.*, 65 B.R. 322 (Bankr.N.D.Ohio 1984). As the *Au* court has noted:

Section 327(a), as it affects the debtor in possession, provides the officers, directors and those who are overseeing the reorganization of the debtor with the detached and impartial advice of counsel. One of the roles of an attorney for a debtor in possession is to act, in effect, as a counterweight to the insiders' tendency to favor their interests above others in the reorganization process. This role is consistent with the notion that whatever benefits the officers, directors and shareholders is not necessarily beneficial to the estate, and vice versa. *Therefore, in the formulation of a plan of reorganization and in dealing with the affairs of the reorganization in general, counsel must act with the utmost loyalty to the debtor, and hence to its estate, free from the danger of his loyalties shifting to other parties.*

tions (a)(4) and (a)(5) of § 1129. Section 1129(a)(4) requires Court approval of payments made under a Chapter 11 Plan.[30] TCO and Pattison argue that the Proponents' failure to include a provision in the Plan providing for Court approval of payments made in connection with the Plan or incident to the case violates § 1129(a)(4). The objectors also contend that the Proponents have failed to disclose the identity, affiliations and compensation of the individuals who will serve as officers of Future on a post-confirmation basis as mandated by § 1129(a)(5).[31]

With respect to the requirements of § 1129(a)(4), Collier states as follows:

This subsection mandates full disclosure of all payments or promises of payment for services, costs, and expenses in connection with the case, and subjects the reasonableness of such payments to the scrutiny and approval of the court.

Section 1129(a)(4) is designed to insure compliance with the policies of the Code that (1) the bankruptcy court should police the awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such information as might affect the claimants' decision to accept or reject the plan. Since claims for compensation for professional services rendered in a chapter 11 case are entitled to priority under section 507(a)(1) ahead of the claims of creditors holding unsecured claims, section 1129(a)(4) protects the integrity of the reorganization process by assuring creditors that payments from the debtor's estate will be subject to court review. It also ensures that each creditor will receive equal treatment since compensation

outside of the plan must be disclosed and made part of the record. Finally, section 1129(a)(4) protects creditors and equity security holders to the extent that review of compensation applications provides some assurance that compensation for services rendered to the debtor's estate is reasonable.

5 *Collier on Bankruptcy* § 1129.02[4] at 1129–28 (15th ed. 1987).

■ The record before the Court is devoid of any evidence which would establish that payments for services or expenses have not been disclosed as required by § 1129(a)(4). Further, the Court finds Pattison's unsupported contention that the Plan must contain a provision stating that all relevant payments will be subject to Court approval to be without merit. Court approval of payments for services and expenses is governed by various Code provisions—*e.g.*, §§ 328, 329, 330, 331 and 503(b) —and need not be explicitly provided for in a Chapter 11 plan. Hence, the Court finds that the Proponents have achieved compliance with § 1129(a)(4).

■ TCO and Pattison also contend that the Proponents have not complied with § 1129(a)(5) inasmuch as the disclosure statement previously approved by the Court failed to contain information regarding the identity, affiliations and compensation of the individuals who will serve as officers of Future on a post-confirmation basis. Plan proponents are required to transmit adequate information to holders of claims and investors to allow a hypothetical reasonable investor to make an informed judgment about a plan. 11 U.S.C. § 1125. The statute states that this infor-

65 B.R. at 335 (emphasis added).

**30.** Section 1129(a)(4) provides in relevant part:
Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case; has been approved by, or is subject to the approval of, the court as reasonable; ....

**31.** Section 1129(a)(5) states:
(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual

proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

mation must be disseminated in the form of a disclosure statement. *Id.* However, the case law establishes that § 1129(a)(5)'s requirements may, under certain circumstances, be satisfied where the necessary disclosures appear elsewhere in the record. *See, In re Landau Boat Co.*, 13 B.R. 788, 790–91 (Bankr.W.D.Mo.1981); *In re Polytherm Industries, Inc.*, 33 B.R. 823, 830 (W.D.Wis.1983). Here, the identity, affiliations and compensation of Future's post-confirmation officers were disclosed at the confirmation hearing. The Court believes that such disclosures are more appropriately made in the context of a disclosure statement. Nevertheless, the Court concludes that the fact that the required disclosures were not made in the disclosure statement, but were instead presented in the course of the confirmation hearing, will not alone serve as a barrier to confirmation of the Plan in this case.

E. *Objection #4: Compliance with § 1129(a)(7)*

▊ TCO and Pattison contend that the Plan fails to meet the so-called "best-interests-of-creditors" test of § 1129(a)(7). Section 1129(a)(7) provides in pertinent part as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

\*　　\*　　\*　　\*　　\*　　\*

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ....

Thus, § 1129(a)(7) requires that with respect to each impaired class, the class must unanimously accept the plan or each holder of a claim within the class must receive under the plan at least what such holder would receive under a Chapter 7 liquidation. *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 584 (Bankr.W.D.Okla. 1987). The Proponents have the burden of establishing that the Plan satisfies § 1129(a)(7). *In re Featherworks Corp.*, 25 B.R. 634, 642–43 (Bankr.E.D.N.Y.1982); *In re Neff,* 60 B.R. 448, 452 (Bankr.N.D. Tex.1985); *In re Hoosier Hi–Reach, Inc.*, 64 B.R. at 37.

Here, members of the following impaired classes have rejected the Plan: C–1 (recorded working interest holders), C–2 (unrecorded working interest holders) and D–1 (allowed unsecured claim holders).[32] Thus, the Proponents must demonstrate that as to the members of Classes C–1, C–2 and D–1, the Plan satisfies § 1129(a)(7).

Several of the arguments advanced by the objectors which have a bearing on the best-interests-of-creditors test have heretofore been rejected by the Court. TCO has argued that it would receive more in a Chapter 7 liquidation because the insider claims (Classes B–3 and B–4) would be equitably subordinated. Having already concluded that the record does not support equitable subordination, the Court finds that this argument is not sustainable. In addition, Pattison's contention that it would realize a greater return in a Chapter 7 liquidation, because its C–1 claim would be granted administrative expense status, must also be rejected in view of Court's prior conclusion that Pattison has not established an entitlement to an administrative expense claim.

▊ Pattison further contends that, if the payment of approximately $107,000 to BancOhio inside the ninety (90) days prior to the petition date were avoided as a preferential transfer, the five percent dividend to be paid to unsecured creditors would not satisfy the best-interests-of-creditors test.[33] This argument is also untena-

32. *See,* footnote 20, *supra.*

33. In ascertaining what creditors would receive in a hypothetical Chapter 7 liquidation, the

Court is required to assign a value to possible recoveries in actions to avoid preferential or fraudulent transfers. *See, In re Toy & Sports*

ble. The evidence adduced at the confirmation hearing establishes that the total value of Future's assets is $327,600. Approximately $600,000 in secured claims, $30,000 in priority claims and $500,000 in unsecured claims are held against the estate. Thus, even if a Chapter 7 trustee were successful in avoiding the $107,000 transfer to BancOhio pursuant to 11 U.S.C. § 547(b), unsecured creditors would, nevertheless, receive no distribution in a liquidation. Accordingly, as to Classes B–5, C–2 and D–1, which consist of unsecured claimholders, the Court concludes that the Plan satisfies § 1129(a)(7).

■ The Court is not persuaded that the holders of Class C–1 claims—*i.e.,* claims secured by retained post-petition production proceeds—will fare better under the Plan than they would if the debtor were liquidated under Chapter 7. In a Chapter 7 liquidation, Class C–1 claimholders would receive the property securing their claims, which, in this case is cash (the post-petition production proceeds). Pursuant to the Plan, Class C–1 claimholders will receive Krutex stock of a value equal to the allowed amount of their claims. For the reasons discussed, *infra,* at pp. 493–96 of this decision, the Court believes that it would be in the best interests of Class C–1 creditors to receive their collateral as opposed to Krutex stock of dubious value and marketability. Accordingly, the Court finds that the Plan does not satisfy § 1129(a)(7) with respect to Class C–1. In addition to the other shortcomings in the Plan which have been detailed above and which will be further discussed below, noncompliance with § 1129(a)(7) precludes the Plan's confirmation.

### F. *Objection #5: Compliance with § 1129(a)(9)*

Section 1129(a)(9)(A) requires claimants entitled to administrative expense priority to be paid in cash in full on the effective date of the Plan. Pattison submits that the Plan is in violation of § 1129(a)(9)(A) because Pattison's "administrative expense claim" will be satisfied by the issuance of Krutex stock as opposed to payment in cash. Since the Court has determined that Pattison has not established an entitlement to an administrative expense claim, the Court holds that the Plan is in compliance with § 1129(a)(9)(A).

### G. *Objection #6: Compliance with the "Cram–Down" Provisions of § 1129(b)*

#### 1. Introduction

The Bankruptcy Code provides two means by which a Chapter 11 plan may be confirmed. The first way, which has been referred to as the "consent" or "acceptance" method,[34] is to meet all eleven requirements of § 1129(a), including subsection (a)(8), which provides that all impaired classes of claims or interests must accept the plan. The second way to achieve confirmation of a plan of reorganization is pursuant to the so-called cram-down provisions of § 1129(b). Section 1129(b) provides that, if a plan meets all of the applicable requirements of § 1129(a), except paragraph (8), the Court, upon request by the proponent of the plan, shall confirm the plan if it does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted the plan. Confirmation under § 1129(b) is referred to as a cram-down because the plan is permitted to go into effect over the objections of one or more impaired classes of creditors. *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 583 (6th Cir.1986).

The Proponents invoke the cram-down provisions of § 1129(b) in an attempt to gain confirmation of the Plan over the objections of TCO and Pattison. The Proponents concede that both Classes C–1 (working interest holders whose claims are secured by production proceeds) and C–2 (unrecorded working interest holders

*Warehouse, Inc.,* 37 B.R. 141, 150 (Bankr.S.D.N.Y.1984).

34. *See generally,* Coogan, *Confirmation of a Plan Under the Bankruptcy Code,* 32 Case W.Res.L. Rev. 301, 325–328, 352–355 (1982).

whose claims are unsecured as a matter of state law) have rejected the Plan. Pattison is a member of both of these dissenting classes.

A dispute exists as to the status of Class D–1, which is comprised of general unsecured creditors, including TCO. Based upon the voting as of the date of the confirmation hearing, the members of Class D–1 had clearly rejected the Plan.[35] However, at the hearing on confirmation, counsel for the Proponents presented the Court with an oral motion seeking leave to permit Ryder Management Company ("Ryder") to change its vote rejecting the Plan to one of acceptance. Initially, no objection was posed to this oral motion and the Court granted the motion. This had the effect of converting Class D–1 from a rejecting class into an accepting class. Later in the hearing, counsel for TCO requested that the Court reconsider its ruling and deny Ryder permission to amend its ballot. TCO's motion is presently pending before the Court.

 Upon consideration of TCO's motion for reconsideration, the Court hereby vacates its previous oral order and rules

that Ryder shall not be permitted to change its vote. B.R. 3018(a)(3) authorizes a change or withdrawal of an acceptance or rejection if two conditions are met: (1) the request to permit a change or withdrawal of an acceptance or rejection is made within the time fixed for acceptance or rejection of the plan; and (2) cause is shown. Here, Ryder sought leave to amend its ballot after the voting deadline had passed. In addition, the Proponents offered no cause to support their request that Ryder be permitted to change its vote. Having failed to satisfy the requisites of B.R. 3018(a)(3), the Court is constrained to hold that Ryder shall not be permitted to change its vote. *See, In re Jartran, Inc.*, 44 B.R. 331, 362–363 (Bankr.N.D.Ill.1984). The Court notes that the practical effect of its ruling is minimal. At the confirmation hearing, the Proponents operated under the assumption that they would be required to satisfy the cram-down standards pertaining to both secured and unsecured creditors, given the fact that a secured class (C–1) and an unsecured class (C–2) had rejected the Plan.[36]

---

**35.** The Court notes that it as faced with some difficulty in determining the results of the voting due to the Proponent's noncompliance with LBR 3.15(c). LBR 3.15(c) provides as follows:

Prior to or at the hearing on confirmation, the proponent of a plan shall certify to the Court the amount and number of allowed claims of each class accepting or rejecting the plan and the amount of allowed interests of each class accepting or rejecting the plan. The original certification shall be filed with the Clerk of the Bankruptcy Court. A copy of the certification shall be served on the debtor, debtor-in-possession, trustee, if any, and any creditors' or equity security holders' committee appointed pursuant to the Code or on the chairperson and counsel for those committees. The Court may find that the plan has been accepted or rejected on the basis of the certification.

A review of the Official Court File reveals that the Proponents have failed to file a certification of the number of allowed claims of each class that have accepted or rejected the Plan and the amount of allowed interests of each class accepting or rejecting the Plan. The Court further notes that its comparison of the Clerk's ballot register with the summary of the voting which was appended to the Proponents' Post-Hearing Memorandum In Support of Confirmation reflects several inaccuracies in the Proponents' summary of the balloting in this case.

**36.** The Proponents' presumption that they would be required to satisfy the cram-down criteria for both Classes C–1 and C–2 may well have been based upon their Plan's misclassification of claims. Section 1122 of the Code prohibits the grouping of dissimilar claims in the same class. However, § 1122 does not address the correlative problem which most frequently arises in the context of classification of unsecured claims: the permissibility of placing similar claims in different classes. Two divergent lines of authority have developed in this area. Compare *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982) and *In re Johnson*, 69 B.R. 726 (Bankr.W.D.N.Y.1987) (holding that a single classification for unsecured creditors is required) with *Matter of Huckabee Auto Company*, 33 B.R. 132 (Bankr.M.D.Ga.1981) and *In re A G Consultants Grain Div., Inc.*, 77 B.R. 665 (Bankr.N.D.Ind.1987) (adopting a more flexible approach to claims classification). *See generally,* Anderson, *Classification of Claims and Interests in Reorganization Cases Under the New Bankruptcy Code*, 58 Am.Bankr.L.J. 99 (1984). In this Circuit, separate classification of similar claims is permitted under certain circumstances—*i.e.*, where the interests of claim holders in a class of impaired claims of a similar legal nature differ substantially (in a manner apart from the legal nature of the claims) from other members in such a class. *See, In re U.S. Truck Co., Inc.*, 800 F.2d at

The presence of an additional rejecting unsecured class imposes no greater burden upon the Proponents in terms of meeting § 1129(b)'s cram-down requirements than existed as of the outset of the confirmation hearing.

### 2. Unfair Discrimination

 TCO submits that the Plan is not in compliance with § 1129(b) because it is unfairly discriminatory. TCO failed to delineate, either in the memorandum supporting its objection to confirmation ("TCO Memorandum"), or in oral argument, the precise manner in which the Plan's treatment of TCO is unfairly discriminatory. Further, no analysis of § 1129(b)'s prohibition against unfair discrimination and its applicability to the case at bar is contained in TCO's Memorandum. Instead, TCO's Memorandum merely states that the Plan "does discriminate unfairly as set forth above." TCO Memorandum at 13. This statement apparently refers to the arguments which had previously been asserted by TCO in its Memorandum with respect to equitable subordination, good faith and the best-interests-of-creditors test of § 1129(a)(7). The Court finds TCO's bare, unsupported contention that the Plan treats TCO in an unfairly discriminatory manner to be without merit.

The Court's independent review of the case law construing § 1129(b)'s prohibition against unfair discrimination reveals that two distinct approaches have been developed by the bankruptcy courts which have applied this cram-down test. The first approach, which the Court would characterize as the restrictive application of the unfair discrimination standard, is exemplified by such cases as *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir.1986) and *In re Martin*, 66 B.R. 921 (Bankr.D.Mont.1986). The *Acequia* and *Martin* courts both held that the unfair discrimination language of § 1129(b) was intended by Congress to apply to a very specific and narrow factual situation: Chapter 11 plans which classify claims or interests that have been subordinated. *In re Acequia*, 787 F.2d at 1364; *In re Martin*, 66 B.R. 929–930.

In *Martin*, a creditor holding an allowed secured claim against the debtor argued that the debtor's plan was unfairly discriminatory. Holding that the secured creditor had miscontrued the meaning of the phrase unfair discrimination, the *Martin* court stated:

> Nothing in the Code aids the determination of whether a Plan "does not discriminate unfairly" with respect to a dissenting class. The legislative history states that the requirement "is included for clarity" and applies in the context of subordinated debentures. The requirement is intended to be complimentary to the fair and equitable test and to permit the court to evaluate the complex relationship inherent in the relative priority of classes caused by partial subordination. In a nutshell, if the Plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate

583–587 (classification of unsecured claim arising from rejection of collective bargaining agreement may be separately classified from unsecured claims of trade creditors). Here, the Proponents have separately classified the class of unsecured claimants (D–1) from Classes B–5 (judgment lien holders), B–6 (Ohio mechanics' lien claimants) and C–2 (unrecorded working interest holders) whose claims are unsecured by virtue of the operation of either state law (in the case of Class C–2) or (in the case of Classes B–5 and B–6), federal bankruptcy law (*see*, 11 U.S.C. § 506(a)). The Court is aware of no valid basis for separately classifying the claims comprising Classes B–5, B–6 and C–2 from the Class D–1 claims. As the Eighth Circuit has recently noted, the distinction between unsecured claims and the undersecured portions of claims, which are deemed to be unsecured pursuant to § 506(a), does not warrant separate classification. *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987). *See also, In re Pine Lake Village Apartment Co.*, 19 B.R. at 831. The Court believes that the rationale of the *Hanson* and *Pine Lake Village* cases is equally applicable in the case *sub judice*. That is, the distinction between general unsecured claims and claims that are deemed to be unsecured by operation of state or federal bankruptcy law is insufficient to justify their separate classification.

unfairly with respect to the dissenting class.

66 B.R. at 929 (quoting Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133, 141–42 (1979)). *See also, In re Acequia,* 787 F.2d at 1364 ("The concept of unfair discrimination applies to plans in which claims or interests have been subordinated.").[37]

Several other bankruptcy courts have given the unfair discrimination language of § 1129(b) a broader construction. These courts have compared the treatment accorded various classes of claimholders under a Chapter 11 plan. If it appeared that a particular creditor or class of creditors was being unfairly singled out and subjected to disparate treatment, denial of confirmation was ordered. *See, e.g., In re Pine Lake Village Apartment Co.,* 19 B.R. at 831; *In re Wieberg,* 31 B.R. 782, 785 (Bankr.E.D.Mo.1983); *In re Elijah,* 41 B.R. 348, 352 (Bankr.W.D.Mo.1984). These decisions do not discuss the elements of their unfair discrimination analysis but merely apply the standard in somewhat of an *ad hoc* fashion. However, the focus of inquiry for the courts which have broadly construed the unfair discrimination language of § 1129(b) appears to be whether a plan segregates two similar claims or groups of claims into separate classes and provides disparate treatment for those classes. *See, e.g., In re Toy & Sports Warehouse, Inc.,* 37 B.R. at 151–52; *In re Jartran, Inc.,* 44 B.R. at 381–83; *Matter of Johns–Manville Corp.,* 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986).

In disposing of TCO's argument, the Court need not state categorically whether it favors a narrow or broad interpretation of § 1129(b)'s proscription against unfair discrimination. TCO's position is not sustainable under either view. Clearly, TCO's claim has not been subordinated—either contractually or pursuant to the Plan. Under the cases which narrowly construe the unfair discrimination standard, the Court's inquiry would end here. Further, the Court's review of the Plan as well as the record made at hearing does not establish that any similarly situated claimholder (*i.e.,* any unsecured creditor) is receiving more favorable treatment than TCO. In short, regardless of which interpretation of § 1129(b)'s unfair discrimination standard is applied, TCO's argument is without support.

3. Fair and Equitable

 (a) *Cram–Down of the C–1 Secured Class*

Section 1129(b)(2) establishes the standards for determining whether a plan is fair and equitable. This section of the Code adopts three different tests to determine whether a plan is fair and equitable depending upon whether the dissenting class is comprised of secured claims, unsecured claims or ownership interests. 11 U.S.C. § 1129(b)(2)(A)–(C). With respect to a class of secured claims, a plan will be deemed to be fair and equitable if it provides:

 (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

 (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

 (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

 (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

Pattison, which is a member of Class C–1 (holders of claims secured by post-petition

---

**37.** Footnote 37 is fully reprinted as Appendix A.

production proceeds), argues that the Plan is not fair and equitable. However, Pattison has inexplicably failed to cite § 1129(b)(2)(A) much less analyze this provision's applicability to the instant issue. Nor have the Proponents referred to § 1129(b)(2)(A) in their memoranda in support of confirmation. This is indeed puzzling, given the fact that the standards enumerated in § 1129(b)(2)(A) clearly are dispositive of the question of whether the Plan may be confirmed over the objection of the Class C–1 claimholders.

The Plan does not provide for deferred cash payments to the members of Class C–1. Thus, § 1129(b)(2)(A)(i) is not applicable. Since the Class C–2 claim holder's collateral consists of cash, such collateral obviously cannot be sold free and clear of liens pursuant to § 1129(b)(2)(A)(ii). Accordingly, the Plan will be found to be fair and equitable with respect to Class C–1 only if a showing is made that the members of this class will realize the indubitable equivalent of their claims. 11 U.S.C. § 1129(b)(2)(A)(iii).

As explained above, § 1129(b)(2)(A) provides three methods for the satisfaction of secured creditors. Two of these methods involve payments in cash and the third calls for the realization by the secured creditors of the indubitable equivalent of their claims. Here, the Proponents do not propose to satisfy the Class C–1 claims with cash payments. Instead, the Plan contemplates the transfer of intangible property— *i.e.*, Krutex stock—to the Class C–1 claimholders in satisfaction of their secured claims. As the Court discusses below, it is unclear whether compliance with the cramdown criteria of § 1129(b)(2)(A) may be achieved by a Chapter 11 plan which, in lieu of cash payments, proposes to satisfy the claims of secured creditors with a transfer of intangible property.[38]

---

38. Several legal commentators have suggested that, because § 1129(b)(2)(A) refers only to payment in cash, unlike § 1129(b)(2)(B) which authorizes the payment of unsecured creditors in non-cash property, § 1129(b)(2)(A)'s cram-down criteria cannot be satisfied through a transfer of property, such as securities, to a dissenting secured claimholder. *See, e.g.*, Pachulski, *The*

In his well-reasoned decision in *In re Sandy Ridge Development Corp.*, 77 B.R. 69 (Bankr.M.D.La.1987), Judge Steen recently analyzed the issue of the permissibility of satisfying § 1129(b)(2)(A)'s cramdown requirements through a transfer of non-cash property to members of a dissenting secured class. The *Sandy Ridge* court stated as follows:

> The question addressed at this point in this opinion is whether a plan is fair and equitable if it requires a secured creditor to take real estate in satisfaction of his claim. The evolution of the bill in its journey through Congress shows a lack of complete agreement between the House and Senate over the use of property to pay secured creditors. H.R. 8200, the original House bill, provided that a plan could be crammed down:

> "[I]f with respect to each class of secured claims ... each holder of a claim of such class will receive or return under the plan ... *property* of a value ... equal to the allowed amount of such claim ..." [Emphasis supplied.]

> The report of the House Judiciary Committee elaborated on this concept of payment of secured claims with tangible property.

> "Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims as determined under proposed 11 U.S.C. § 506(a). The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money. As used throughout this subsection, 'property' includes both tangible and intangible property, such as a security of the debtor or a successor to the debtor under a reorganization plan.

*Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code,* 58 N.C.L.Rev. 925, 949 (1980); Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133, 156 (1979); Fortgang & Mayer, *Valuation In Bankruptcy,* 32 U.C. L.A.L.Rev. 1061, 1123 (1985).

However, this language about payment of secured creditors with property was not enacted.

\* \* \* \* \* \*

There is no explicit statement in the statute *as enacted* for cramdown of a plan on secured creditors calling for payment in property.

The deletion of the H.R. 8200 language and enactment of language calling for payment in *cash* or the indubitable equivalence, is significant. If Congress wanted to provide for payment of secured creditors in property, it could have left H.R. 8200 alone.

I conclude that Congress refined its language to the result that payment in cash is specifically authorized and that payment in property is permissible in cramdown only if that transaction is the indubitable equivalence of cash paid on sale or in installments secured by a lien.

77 B.R. at 72 (footnotes omitted).

A number of other courts have held that the "indubitable equivalent" language of § 1129(b)(2)(A)(iii) contemplates nonmonetary satisfaction of claims. *See, e.g., In re Sun Country Development, Inc.,* 764 F.2d 406, 409 (5th Cir.1985); *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir. 1985). However, while courts have held that the indubitable equivalent may contain nonmonetary components, stringent standards of equivalence are required by § 1129(b)(2)(A)(iii). *See, e.g., In re Wieberg,* 31 B.R. at 784–85 (indubitable equivalent not provided when collateral worth over $300,000 less than amount of creditor's allowed secured claim was to be turned over to creditor; saving in foreclosure costs did not compensate for loss of deficiency claim); *Matter of Gemini at Dadeland, Ltd.,* 36 B.R. 129, 130–31 (Bankr.S.D.Fla.1983) (indubitable equiva-

lent not provided to secured creditor where appraisal evidence as to security was problematical and mechanics liens might encroach on the security).[39]

■ This Court concurs with the conclusion reached in the decisions discussed above that satisfaction of a secured claim in property is permitted in the context of a cram-down only if a showing can be made that the property transferred is the indubitable equivalent of cash paid on sale or installments secured by a lien. However, the Court stresses, as did the court in *Sandy Ridge,* that the indubitable equivalence standard is an exacting one:

> Not only must the Court conclude that the equivalent will be "realized", but that conclusion must be "indubitable." One is impressed with the burden that such a test involves when one considers that "indubitable" connotes a conclusion more certain than proof by a preponderance of the evidence and even beyond "a reasonable doubt"; the conclusion must be *in*dubitable. If reasonable people can differ on the valuation of property, the valuation might be proved by a preponderance of the evidence but the conclusion would not be "indubitable." It is hard to imagine an appraisal that is "indubitable."

77 B.R. at 73. *See also, In re Walat Farms, Inc.,* 70 B.R. at 334 (Indubitable means "too evident to be doubted.").

Both the *Sandy Ridge* and *Walat Farms* decisions involved proposed transfers of real property to secured creditors. However, these cases also discussed (albeit in *dicta* ) the permissibility of transfer of intangible property, such as stock, to secured claimholders as a means of satisfying § 1129(b)(2)(A)(iii). The *Sandy Ridge* court concluded as follows:

---

39. The Court notes that it would be possible to design a plan calling for a transfer of property that would clearly meet the exacting indubitable equivalence standard of § 1129(b)(2)(A)(iii). Such a transfer would necessarily include a margin for error, *i.e.,* a surplus of value, so that realization of equivalence would be indubitable. A plan of this type could not be crammed down over the objection of junior dissenting creditors. Clearly, overpayment of senior creditors is vio-

lative of the fair and equitable standard. *See, In re Walat Farms, Inc.,* 70 B.R. 330, 335 (Bankr.E. D.Mich.1987); *In re Sandy Ridge Development Corp.,* 77 B.R. at 74. The legislative history of the Code also indicates that a plan may not be crammed down over a dissenting class if a senior class receives more than 100% of its claim. *See,* Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133, 142 (1979).

When a fungible commodity trades in an established, liquid market, there is likely to be little doubt about its value and realization of that value; however, there will generally be little, if any, § 1129(b)(2)(A)(iii) dispute about such value since the property can simply be sold and the creditor paid under the authority of § 1129(b)(2)(A)(ii). One should note the limitations of this conclusion to *fungible* commodities in *established, liquid* markets. If there is even a "little" doubt then the conclusion is not "indubitable."

77 B.R. at 74–75.

■ Applying the principles discussed above to the case *sub judice* leads to the inescapable conclusion that the Proponents have failed to satisfy § 1129(b)(2)(A)(iii). The Proponents have proposed a transfer of Krutex stock to the members of Class C–1 in satisfaction of their secured claims. As the court in *Sandy Ridge* held, if the stringent indubitable equivalence standard is to be met, a debtor proposing to transfer intangible property in satisfaction of a secured claim must establish that such property is a fungible commodity which is traded in an established liquid market. Here, the Proponents have failed to make such a showing.

The evidence revealed that Krutex's stock is not listed on an established stock exchange. Instead, Krutex shares are listed in the "Pink Sheets" which are published daily by the National Quotation Bureau. The testimony of the Proponents' witness, Hoover, established that, including Marich (Hoover's employer), there are no more than ten small brokerage companies which "make a market" in Krutex stock. Hoover conceded that Marich could not guarantee that it would purchase any fixed number of Krutex shares. Marich's trading policy with respect to Krutex stock would vary according to market conditions. Hoover provided no testimony regarding the trading policies of other Krutex stock marketmakers. Hoover further acknowledged that there has been great fluctuation in the price of Krutex stock in the six months preceding the confirmation hearing. Thus, the record made at hearing fails to establish that the Krutex stock is traded in an established, liquid market. Instead, the evidence establishes that the Krutex stock is thinly traded and that Krutex stockholders may experience difficulties in selling their shares due to illiquidity.[40] In short, it is beyond cavil that the Class C–1 claimholders receiving Krutex stock will not realize the indubitable equivalent of their claims.[41] Accordingly, the Court finds that the Proponents have failed to satisfy the cramdown requirements of § 1129(b)(2)(A)(iii) with respect to Class C–1.

(b) *Cram–Down of the C–2 and D–1 Unsecured Classes*

Section 1129(b)(2)(B) provides that, with respect to a class of dissenting unsecured creditors, a plan will be deemed to be fair and equitable if one of two tests is met. First, the plan may provide that each unsecured creditor in the class receive or retain property having a value, as of the effective date of the plan, equal to the allowed amount of its claim. 11 U.S.C. § 1129(b)(2)(B)(i). Here, the Plan does not provide the unsecured creditors in Classes C–2 and D–1 with property equal to the amount of their allowed claims. Hence, the Plan does not meet the fair and equitable standard of § 1129(b)(2)(B)(i).

**40.** The fact that the "Pink Sheet" market is neither established nor liquid appears to be widely recognized. *See, e.g.,* Ingersoll, *School for Scam: Fraud Pervades the Market for Pink Sheet Stocks,* Wall St.J., Feb. 2, 1988, at 1, Col. 6, and 18, Cols. 1 and 2 ("[S]cams aren't the only pitfalls for Pink Sheet investors. The spreads between bid and asked prices are sometimes immense in thinly traded issues. Illiquidity is common: Shortages of shares develop when the price rises and shortages of buyers develop when the price starts slipping.")

**41.** The Court questions why, if the Krutex stock is indeed a highly marketable commodity as the Proponents claim, the Proponents have not merely sold the stock to third-parties through the Pink–Sheet market and utilized the cash generated therefrom to satisfy the Class C–1 claims. *Cf., In re Walat Farms, Inc.,* 70 B.R. at 334; *In re Sandy Ridge Development Corp.,* 77 B.R. at 74–75.

Alternatively, a plan of reorganization may provide any treatment for a class of unsecured creditors, including no participation at all, so long as no junior claims or interests participate in the plan or retain an interest in the debtor's property. 11 U.S.C. § 1129(b)(2)(B)(ii). Essentially, § 1129(b)(2)(B)(ii) applies a modified version of the traditional absolute priority rule, which was initially established in *National Pacific Railway Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). Simply stated, the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under the plan.

In cases decided after *Boyd*, the Supreme Court recognized an exception to the absolute priority rule. In *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the Court stated as follows:

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Railway Co. v. Boyd*, *supra* [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931] and *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, *supra* [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028]. Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.

*Id.* at 121, 60 S.Ct. at 10 (footnotes omitted).

██ Thus, an exception to the absolute priority rule has been established by the decisional law. This exception provides that a holder of a claim or interest may receive a distribution or retain an interest in the reorganized debtor, even though all senior classes of creditors are not to be paid in full under the plan, if the holder of the claim or interest makes a contribution of new capital in the form of money or money's worth that is reasonably equivalent in value to the interest retained or the distribution received. *Case v. Los Angeles Lumber Products Co.*, *supra; Kansas City Terminal Railway Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926); *Sophian v. Congress Realty Co.*, 98 F.2d 499 (8th Cir. 1938); *In re U.S. Truck, Co., Inc.*, 800 F.2d at 588; *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986); *In re Landau Boat Co.*, 13 B.R. at 792–93; *In re Jartran*, 44 B.R. at 367; *In re Brown's Industrial Uniforms*, 58 B.R. 139 (N.D.Ill.1985); *In re Witt*, 60 B.R. 556 (Bankr.N.D.Iowa 1986). The Proponents assert that Canyon has made a substantial contribution of new capital to the debtor. Hence, they submit that the absolute priority rule has been satisfied and the Plan may be crammed down over the objection of the dissenting unsecured classes. This contention will be examined below.

Canyon asserts that its new capital contribution, which justifies retention of a 100% ownership interest in Future, consists of the following: (1) Canyon's release of Future from all liability on the secured claims of Halliburton and Ohio Steel; (2) Canyon's payment of its own attorney fees attributable to the formulation and presentation of the Plan; and (3) Canyon's commitment to fund the five percent distribution to unsecured creditors (in the approximate amount of $35,000) in the event Future cannot fund such a distribution. TCO and Pattison argue that Canyon's release of claims does not constitute a capital contribution. Alternatively, the objectors submit that, if Canyon's release of the Halliburton and Ohio Steel claims is deemed to be a capital contribution, it is not such a substantial capital contribution as would allow Canyon's retention of an ownership interest in Future.

TCO and Pattison urge the Court to rule that Canyon's release of Future from liability on the Halliburton and Ohio Steel claims does not constitute a capital contribution. The Proponents, on the other

hand, submit that Canyon's proposed release should be deemed to be a capital contribution which is sufficient to satisfy the exception to the absolute priority rule established in *Case.* In support of this proposition, the Proponents cite *United States v. Cole,* 90 F.Supp. 147 (S.D.Cal. 1950) and *Crow v. Newspaper Dealer Supply, Inc.,* 603 F.Supp. 847 (E.D.Mo.1985). Each of these cases is clearly inapposite. Neither *Cole* (a criminal income tax evasion case) nor *Crow* (action to recover on a promissory note which was brought in federal court due to diversity of citizenship) deal with bankruptcy law, much less the present issue. These decisions provide absolutely no support for the Proponents' argument. Instead, these cases merely state, in *dicta,* that under state law (in California and Missouri, respectively) shares of stock may be issued by a corporation in return for foregiveness of debt.

The Court's review of the case law has revealed no decision which squarely addresses the issue before it: Should Canyon's release of claims be deemed to be a capital contribution? In the vast majority of the reported decisions reviewed by the Court, the party seeking to retain an ownership interest in the reorganized debtor made a capital contribution in the form of cash or property. Two recent decisions have dealt with an analogous question: Whether a shareholder's guarantee of the debt of the reorganized debtor constitutes a capital contribution? In both *In re Potter Material Service, Inc., supra,* and *In re Sawmill Hydraulics, Inc.,* 72 B.R. 454 (Bankr.C.D.Ill.1987), it was held that a shareholder's guarantee of the debt of the reorganized debtor should be deemed to be a capital contribution. The principle which may be derived from these decisions is that, if the transaction in question both benefits the debtor and places the shareholder in a position of economic risk, a

capital contribution within the meaning of *Case* and its progeny shall be deemed to have been made.[42] *In re Sawmill Hydraulics, Inc.,* 72 B.R. at 457.

Applying the principles postulated by the courts in *Potter Material Service* and *Sawmill Hydraulics* to the present case, the Court concludes that Canyon's release of claims may be deemed to be a form of capital contribution. The release of two fairly substantial secured claims is of obvious benefit to the debtor. Moreover, the economic risk criterion also is clearly satisfied. Indeed, if Canyon executes a release of the Halliburton and Ohio Steel claims and Future then fails to comply with the terms of its confirmed plan, Canyon will certainly sustain a very real economic loss. Accordingly, the Court concludes that Canyon has assumed an economic risk in releasing Future from liability on the Halliburton and Ohio Steel claims and, hence, this transaction shall be viewed as a capital contribution.

Unlike the guarantees involved in the *Potter Material Service* and *Sawmill Hydraulics* cases, Canyon's release of claims is susceptible to valuation. But, on the record made at hearing, the Court is unable to ascertain the value of Canyon's capital contribution. The evidence adduced at the confirmation hearing established that the face amounts of the Halliburton and Ohio Steel claims are $231,578.95 and $91,310.01, respectively. These claims were purchased by Canyon for $105,000 and $17,000, respectively. While the Court was informed of the purchase price paid by Canyon to obtain assignments of these claims, absolutely no evidence was presented to establish the value of the collateral securing the Halliburton and Ohio Steel claims. Pursuant to § 506(a) of the Code, the value of the Halliburton and Ohio Steel claims should be fixed at the value of the collateral secur-

**42.** Essentially, the Court must determine whether Canyon's release of secured claims constitutes a contribution in "money's worth." *See, Case v. Los Angeles Lumber Products Co.,* 308 U.S. at 122, 60 S.Ct. at 10. The most expansive interpretation of the phrase "money's worth" was given by the Eighth Circuit in *In re Ahlers,* 794 F.2d 388 (8th Cir.1986). In *Ahlers,* the court held that a debtor's contribution of labor and expertise to his farming operation was a capital contribution in money's worth within the meaning of *Case. Id.,* at 402. The oft-criticized *Ahlers* decision is presently on appeal to the Supreme Court, *see, Norwest Bank Worthington v. Ahlers,* —— U.S. ——, 107 S.Ct. 3227, 97 L.Ed.2d 733 (1987) (granting certiorari).

ing these claims.[43] Absent evidence as to the value of such collateral, the Court is simply unable to place a dollar amount upon Canyon's "capital contribution."[44]

Canyon also submits that its capital contribution consists of its payment of the attorney fees which were expended in connection with the formulation and presentation of the Plan. Payment of professional fees of a debtor that is seeking confirmation of a Chapter 11 plan has been deemed to be an element of a capital contribution for purposes of satisfying the absolute priority rule. *See, In re Potter Material Service*, 781 F.2d at 102. Review of the record reveals, however, that no testimony regarding the amount of attorney fees incurred by Canyon in formulating and presenting the Plan was offered. Accordingly, the Court is left again with insufficient evidence to ascertain the total amount of Canyon's capital contribution.

Finally, the Court notes that it has not considered Canyon's promise to fund the proposed five percent distribution to unsecured creditors (in the event Future is unable to do so from post-petition operating revenues) as a component of Canyon's capital contribution. It is well-established that a new capital investment must be a present contribution, not a contribution promised in the future. *See, In re Pecht*, 57 B.R. 137, 140–41 (Bankr.E.D.Va.1986); *In re Stegall*, 64 B.R. 296, 299 (Bankr.C.D. Ill.1986). Thus, Canyon's promise of a future contribution is not properly included as an element of its proposed capital contribution.

Under the *Case* decision, the Court is required to make a comparison between the value of the shareholder's retained interest in the reorganized debtor and such shareholder's new capital investment in order to determine whether the new investment equals or exceeds the retained interest in the corporation. 308 U.S. at 121, 60 S.Ct. at 10. *See also, In re Potter Material Service, Inc.*, 781 F.2d at 101; *In re Landau Boat Co.*, 13 B.R. at 792–93; *In re Marston Enterprises*, 13 B.R. 514, 518 (Bankr.E.D.N.Y.1981); *In re Ag Consultants Grain Div., Inc.*, 77 B.R. at 677–78. As the foregoing discussion indicates, the Court is unable to ascertain the value of Canyon's proposed capital contribution due to glaring deficiencies in the record. As the Court demonstrates below, the incomplete record made by the Proponents at hearing likewise precludes the Court from determining a value for Canyon's retained interest in the reorganized debtor.

As the Seventh Circuit has recently stated, "[t]he valuation of a corporate debtor is a complex task, requiring an evaluation of considerable data concerning the past, present, and future operations of the debtor." *In re Potter Material Service, Inc.*, 781 F.2d at 104. The appropriate standard for valuing a company undergoing reorganization was articulated by the Supreme Court in *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). The Court said:

> The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. Since its application requires a prediction as to what will occur in the

---

**43.** Because unsecured creditors will receive five percent of their allowed claims under the Plan, an amount equal to five percent of the unsecured portions of the Halliburton and Ohio Steel claims also should be added to the sum representing the value of the collateral securing such claims in order to arrive at the total value of Canyon's capital contribution.

**44.** The Court does not believe that its holding, that a release of claims may be deemed to be a capital contribution within the meaning of *Case* [308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110], constitutes an unduly broad interpretation of the

phrase money's worth. Unlike labor and expertise, which the *Ahlers* [794 F.2d 388] court concluded was a cognizable capital contribution, the claims released by Canyon may readily be valued pursuant to 11 U.S.C. § 506(a). Further, while labor is not viewed to be a liquid commodity, the liquidity of the claims which were released by Canyon has been established. Indeed, the fact that the claims in question are liquid commodities has been amply demonstrated by the numerous assignments of claims which occurred between creditors in this case on both a pre-petition and post-petition basis.

future, an estimate, as distinguished from mathematical certitude, is all that can be made. *But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.* A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate.... The Circuit Court of Appeals correctly left the matter of a formal appraisal to the discretion of the District Court. The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case.

*Id.* at 526–27, 61 S.Ct. at 685 (citations omitted) (emphasis added).

The method of valuing a shareholder's retained interest which was set forth in *Consolidated Rock Products* has been followed almost universally by subsequent decisions. *See, e.g., In re Potter Material Service, Inc.,* 781 F.2d at 103–04; *In re Landau Boat Co.,* 13 B.R. at 792–93; *Matter of Huckabee Auto Co.,* 33 B.R. at 140–41; *In re Jartran,* 44 B.R. at 368; *In re Baugh,* 73 B.R. 414, 419 (Bankr.E.D.Ark. 1987). This valuation process, which is akin to the procedure that was followed by bankruptcy courts in determining whether a plan under Chapter X of the Bankruptcy Act met the fair and equitable test,[45] has been described as follows:

> The method of valuation adopted by the courts [under the Act] for determining the business debtor's "reorganization value" was the "going concern" value based on a capitalization of prospective earnings. This approach was justified by the fact that the very purpose of a reorganization proceeding is to avoid a forced sale of assets and to preserve the going concern value of the business by continuing its operations. It is incongruous to value a business that is being reorganized on the basis of the price its assets could fetch on a piecemeal liquidation when the entire theory of the reorganization is that the debtor is being preserved as a going concern. Accordingly, the business was properly valued as an integrated unit, not as discrete pieces of property to be sold. Moreover, the use of going concern value was thought to free reorganization value from prices pegged by forced sales, temporary conditions of the market place, or an artificially depressed market caused by the reorganization proceeding itself.

 \* \* \* \* \* \*

Because "going concern value" will continue to be used for certain purposes under the Code, it is important to understand that method of valuation. Although the valuation of an enterprise on the basis of a capitalization of prospective earnings is a difficult process, the theory is simple. A projected stream of income in the future has a discounted present value based upon an interest factor, to account for the time value of money, and a risk factor, to account for the possibility that the projected stream of income may never be realized. The process of enterprise valuation thus requires projecting the enterprise's income stream and then determining a discounted present value for that income stream by multiplying the average annual projected income by a multiplier based on an appropriate capitalization rate.

Thus, the determination of the debtor's value as a going concern actually requires two determinations. First, the future earnings of the reorganized debtor must be projected. These projections must be based, not on past earnings alone, but on factors that may influence income in the future. Of course, mathe-

---

**45.** *See,* Coogan, *Confirmation of a Plan Under the Bankruptcy Code,* 32 Case W.Res.L.Rev. 301, 352–54 (1982); Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative,* 39 Bus.Law. 441, 452–53 (1984); Booth, *The Cramdown on Secured Creditors: An Impetus Toward Settlement,* 60 Am.Bankr.L.J. 69, 99–101 (1986).

matical precision in these projections is neither possible nor required.

Second, once earnings are projected, the average annual projected earnings are discounted to a present value on the basis of a capitalization rate that reflects the expected annual rate of return that investors would require on an investment of comparable risk. This discounting is accomplished by multiplying the average annual projected earnings by a multiplier that is the inverse of the capitalization rate. For example, if the capitalization rate (that is, the expected rate of return) were 20 percent, the multiplier would be 5; if the capitalization rate were 10 percent, the multiplier would be 10. Thus, the higher the expected rate of return required by investors, the lower the multiplier and thus the lower the going concern value of the debtor.

The general standard for determining the appropriate capitalization rate is that the capitalization rate should be consonant with the " 'risk factor of the particular enterprise, measured largely by its past experience and the experiences of businesses similarly situated.' " The uncertainty inherent in attempting to fix a capitalization rate can be mitigated when a court has available to it information regarding price/earnings ratios employed in the sale of comparable enterprises under more or less similar conditions, or capitalization rates employed in fixing the market price of securities of comparable companies.

Pachulski, *The Cram Down and Valuation Under Chapter 11 of The Bankrupt-*cy *Code,* 58 N.C.L.Rev. 925, 938–41 (1980) (footnotes omitted).[46]

Here, the Court is unable to determine the value of Canyon's retained interest in Future pursuant to the *Consolidated Rock Products* formula for a number of reasons. As noted above, in projecting the future earnings of a reorganized debtor, the Court must examine the debtor's past earnings record. No testimony regarding Future's past earnings record was offered by the Proponents.[47] Further, a bankruptcy court's projection of future earnings should not be based on past earnings alone. An analysis of the factors that may influence income in the future must be made. *See, Protective Comm. For Ind. Stock. v. Anderson,* 390 U.S. 414, 451–53, 88 S.Ct. 1157, 1177–78, 20 L.Ed.2d 1 (1968) (addressing the bankruptcy court's valuation of a corporation under Chapter X of the Act). *See generally,* Pachulski, *The Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code,* 58 N.C.L.Rev. 925, 940 (1980). Here, no analysis of the factors which would influence the future income of the debtor was offered by the Proponents. No testimony pertaining to the market conditions in the oil and gas industry was presented. The Proponents presented no testimony concerning the planned future business activities of the debtor. Future is in the business of facilitating investment in oil and gas drilling and completion projects. Thus, the Court presumes that the debtor will not simply maintain the *status quo* with respect to operations for the indefinite future, but, instead, will continue to promote drilling programs. Although this presumption may be incorrect, the Court is

---

**46.** The valuation of the reorganized debtor is necessarily an imprecise process. One commentator has described the procedure as "a guess compounded by an estimate." Coogan, *Confirmation of a Plan Under the Bankruptcy Code,* 32 Case W.Res.L.Rev. 301, 313 (1982). Several commentators have noted that the expense, uncertainty and delay which are attendant to cram-down litigation in general, and the valuation of the reorganized debtor in particular, serve as a powerful incentive for counsel to negotiate and settle disputed matters in order to achieve confirmation pursuant to the acceptance method of § 1129(a). *See generally,* Booth, *The Cramdown on Secured Creditors: An Impetus Toward Settlement,* 60 Am.Bankr.L.J.

69 (1986); Miller, *Bankruptcy Code Cramdown Under Chapter 11: New Threat to Shareholder Interests,* 62 B.U.L.Rev. 1059, 1082–83 (1982); Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative,* 39 Bus. Law. 441, 454 (1984) ("Valuation of the company is something that sophisticated participants in any significant chapter 11 reorganization avidly desire to avoid.").

**47.** The Templeton appraisal set forth the historical production with respect to Future's wells, but no analysis of the earnings attributable to such wells was undertaken by Templeton.

unable to assess this factor's impact upon the valuation calculus since no evidence was adduced by the Proponents regarding the debtor's intentions with respect to the promotion of future oil and gas drilling and completion programs.

In attempting to undertake the valuation procedure described in *Consolidated Rock Products* and subsequent cases, the Court found the information contained in Templeton's appraisal report, as well as the testimony of James, to be of little assistance. First, the Court notes that the appraisal was somewhat dated, having been performed in February, 1987. Second, several of the assumptions upon which the projection of the debtor's future income from existing oil and gas wells and gas pipelines appear to be suspect. For example, Templeton's appraisal presumes that oil and gas prices will remain constant from the present through the year 2002. This presumption obviously strains credulity. Finally, the Court notes that James' testimony regarding the capitalization rate which he applied for purposes of discounting to present value the projected income from Future's existing oil and gas wells and gas pipelines to be unilluminating. James merely characterized the 10% figure which he utilized as a "standard SEC rate." Transcript at 92. No explanation of why this 10% rate is appropriate was provided by James.

Finally, in assessing the value of Future as a postconfirmation going concern, the Court must consider the reduction of indebtedness which is effected by the Plan. *See, In re Toy & Sports Warehouse, Inc.,* 37 B.R. at 151; *In re Jartran, Inc.,* 44 B.R. at 377–79. Here, no testimony regarding Future's post-confirmation debt structure was offered.

In short, in order to determine the value of the interest being retained by Canyon, the Court is required to employ a complex and multi-faceted valuation procedure. This procedure envisions an examination by the Court of "all facts relevant to future earnings capacity and hence to present worth." *Consolidated Rock Products v. DuBois,* 312 U.S. at 526, 61 S.Ct. at 685. Due to the incomplete record made by the Proponents at hearing, the Court simply does not possess sufficient information to undertake the analysis contemplated by the *Consolidated Rock Products* case. The Proponents clearly bear the burden of proving the value of Canyon's retained interest. *In re Sawmill Hydraulics, Inc.,* 72 B.R. at 458; *In re Ag Consultants Grain Div., Inc.,* 77 B.R. at 678. Because the Proponents have failed to satisfy this burden, the Court holds that the Plan does not meet the fair and equitable standard with respect to Classes C–2 and D–1.[48]

H. *Compliance with the "Feasibility Test" of § 1129(a)(11)*

Section 1129(a)(11) contains the so-called "feasibility" test for confirmation. This section provides that the Court shall confirm a plan of reorganization only if:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for future financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

In *Agawam v. Creative Marketing Assoc., Inc.,* the purpose of the feasibility requirement was described by Judge Gabriel as follows:

The purpose of section 1129(a)(11) is manifold: 1) to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation, 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, and 3) to promote the willingness of those who deal with post-confirmation

---

**48.** The Court rejects the Proponents' disingenuous argument that the stock being retained by Canyon is worthless becasue the debtor is insolvent at the present time. As discussed above, the true value of the reorganized corporate entity must be determined pursuant to the capitalization of future earnings formula articulated in the *Consolidated Rock Products* [312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982] case. *See, Matter of Huckabee Auto Co.,* 33 B.R. at 141.

debtors to extend the credit that such companies frequently need.

63 B.R. at 619 (citations omitted).

In assessing whether a plan is feasible, the bankruptcy court has "an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir. 1985) (quoting *United Properties, Inc. v. Emporium Department Store, Inc.*, 379 F.2d 55, 64 (8th Cir.1967)). As the *Monnier Brothers* court stated, "success need not be guaranteed." 755 F.2d at 1341. "All that is required is that there be reasonable assurance of commercial viability." *In re Prudential Energy Co.*, 58 B.R. at 862.

■ The Court's scrutiny of the Plan for purposes of determining whether the feasibility requirement has been met should include an examination of the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re U.S. Truck Co., Inc.*, 800 F.2d at 589; *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.N.J.1980); *In re Prudential Energy Co.*, 58 B.R. at 862–63; *In re Agawam Creative Marketing Assoc., Inc.*, 63 B.R. at 619–20.

■ The issue of compliance with § 1129(a)(11) was not raised by the objectors. Nevertheless, as noted above, the Court has an independent duty to determine that all of § 1129(a)'s confirmation criteria have been met. The Court concludes that the Proponents have failed to establish that the Plan is feasible. The incomplete nature of the record made at the confirmation hearing has been discussed in detail above. It is sufficient for purposes of resolving the instant issue to point out that the Proponents failed to address most, if not all, of the criteria delineated in the cases cited above for determining the feasibility of a plan of reorganiza-tion. The failure of the Proponents to demonstrate compliance with § 1129(a)(11) is an additional ground for denial of confirmation of the Plan.

## V. CONCLUSION

Based upon the foregoing, confirmation of the Third Amended Plan of Reorganization shall be, and the same hereby is, DENIED.

IT IS SO ORDERED.

## APPENDIX A

Legal commentators have also pointed out that the unfair discrimination standard of § 1129(b) was intended by the Code's drafters to apply to a narrowly circumscribed factual setting:

The Code itself does not articulate any standards for determining whether a plan "discriminates unfairly" with respect to a dissenting class. Nevertheless, the scope of the antidiscrimination requirement contained in section 1129 is suggested by considering what it does not cover. Section 1123(a) of the Code, which sets forth the required contents of a plan, already covers discrimination among members of a given class. The treatment to be accorded to a class vis-a-vis unequal classes is dealt with by the "fair and equitable" requirement, which, when applicable, requires that a senior class be compensated in full before a junior class may participate in the plan. By process of elimination, therefore, the requirement that a plan not "discriminate unfairly" seems to be designed to ensure that the dissenting class is not treated in an unfairly discriminatory manner vis-a-vis other classes of equal rank. This standard is most likely to come into play when two classes of equal rank occupy unequal positions with respect to a third class.

This situation typically arises when certain creditors have subordinated their claims to the claims of some, but not all, of the creditors who would otherwise fall within the same class absent the subordination agreement. For example, the

unsecured claims may include debts to suppliers or "trade" debt; bank debt; and debentures that are contractually subordinated to the bank debt, but not to the trade debt. Absent the subordination agreement, all three types of claims would fall within the single class of unsecured claims. Because of the subordination agreement involving the debentures and the bank debt, however, it becomes necessary to subclassify the unsecured creditors into three classes. In such a case, the class of bank claims would be senior to the class of debenture claims, but each of those classes would be of equal rank with the trade debt, which is not affected by the subordination agreement. The "fair and equitable" requirement would, if applicable, govern the fairness of the distribution as between the senior bank debt and the subordinated debenture debt.

The antidiscrimination requirement mandates that the subordination agreement be enforced to the extent of its terms, but no more. Accordingly, any subclass consisting of claims that are neither subordinated nor the beneficiaries of any subordination agreement should receive its aliquot share of the total distribution made under the plan on account of all of the claims that would otherwise fall within the same class absent the subordination agreement. The aliquot share of that total distribution to which the subordinated creditors would otherwise be entitled should be paid over to the beneficiaries of the subordination agreement up to the amount which, when added to the beneficiaries' aliquot share of the total distribution, would cause them to receive property of a value equal to their allowed claim.

Pachulski, *The Cram Down and Valuation Under Chapter 11 of The Bankruptcy Code*, 58 N.C.L.Rev. 925, 936–937 (1980) (footnotes omitted).